PRIVILEGED & CONFIDENTIAL

EXECUTION COPY

# ASSET PURCHASE AGREEMENT

between

## SFR II HOLDINGS, LLC,

as "Buyer"

and

## UNIQUE VENTURES GROUP, LLC

as "Seller"

Closing Date: [___], 2017

{6928206:17}

**EXHIBIT
A**

## Table of Contents

ARTICLE I.      PURCHASE AND SALE OF THE ACQUIRED ASSETS ..............................1

    Section 1.1      **Transfer of Acquired Assets.**...................................................1
    Section 1.2      **Excluded Assets.** ..................................................................3
    Section 1.3      **Assumption of Liabilities.**.....................................................4
    Section 1.4      **Excluded Liabilities.**.............................................................5
    Section 1.5      **Post-Closing Liabilities.**.......................................................5
    Section 1.6      **Assumption and Assignment of Designated Contracts.**...........5

ARTICLE II.      CONSIDERATION .........................................................................7

    Section 2.1      **Purchase Price.** ....................................................................7
    Section 2.2      **Payment of Cure Costs.** ........................................................7
    Section 2.3      **Prorations.**...........................................................................7
    Section 2.4      **Transaction Taxes.** ..............................................................7
    Section 2.5      **Allocation of Purchase Price.** ...............................................8

ARTICLE III.      CLOSING AND DELIVERIES.........................................................8

    Section 3.1      **Closing.**................................................................................8
    Section 3.2      **Seller's Deliveries.** ..............................................................8
    Section 3.3      **Buyer's Deliveries.**...............................................................8

ARTICLE IV.      REPRESENTATIONS AND WARRANTIES ......................................9

    Section 4.1      **Representations and Warranties of Seller.** .............................9
    Section 4.2      **Representations and Warranties of Buyer.** .............................9
    Section 4.3      **Warranties Are Exclusive.**..................................................11

ARTICLE V.      COVENANTS AND OTHER AGREEMENTS......................................11

    Section 5.1      **Covenants of Seller.**...........................................................11
    Section 5.2      **Covenants of Buyer.** ..........................................................13
    Section 5.3      **Other Covenants.**................................................................13
    Section 5.4      **Bankruptcy Matters; Bidding Process.** ................................14

ARTICLE VI.      CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ............15

    Section 6.1      **Conditions Precedent to Performance by Seller.** ....................15
    Section 6.2      **Conditions Precedent to the Performance by Buyer.** ..............15

ARTICLE VII.      TERMINATION .........................................................................16

    Section 7.1      **Conditions of Termination by Buyer Prior to the Specified Date.** ...........16
    Section 7.2      **Conditions of Termination at Any Time Prior to Closing.**.......16
    Section 7.3      **Effect of Termination; Remedies.** .......................................17
    Section 7.4      **Exclusive Remedy; Waiver.** ................................................18

ARTICLE VIII.      SURVIVAL AND INDEMNIFICATION ..........................................18

    Section 8.1      **Survival; Indemnification.**..................................................18
    Section 8.2      **Specific Performance.** ........................................................19

ARTICLE IX.      MISCELLANEOUS .....................................................................19

**Section 9.1**    **Allowed Administrative Expenses.** ..................................................19
**Section 9.2**    **Alternative Transaction.** ...........................................................19
**Section 9.3**    **Further Assurances.** ..................................................................19
**Section 9.4**    **Successors and Assigns.** ...........................................................19
**Section 9.5**    **Governing Law; Jurisdiction.** ..................................................19
**Section 9.6**    **Expenses.** ...................................................................................19
**Section 9.7**    **Severability.** ..............................................................................19
**Section 9.8**    **Notices.** ......................................................................................20
**Section 9.9**    **Amendments; Waivers.** .............................................................21
**Section 9.10**   **Public Announcements.** ............................................................21
**Section 9.11**   **Entire Agreement.** .....................................................................21
**Section 9.12**   **No Third Party Beneficiaries.** .................................................22
**Section 9.13**   **Headings.** ...................................................................................22
**Section 9.14**   **Counterparts; Delivery.** ...........................................................22
**Section 9.15**   **Construction.** .............................................................................22
**Section 9.16**   **Bulk Sales.** .................................................................................22
ARTICLE X.    DEFINITIONS ..................................................................22

## EXHIBITS

Exhibit 5.4(b)(i) ................................................................Sale Procedures Order

Exhibit 5.4(b)(ii) ..........................................................................Sale Order

## SCHEDULES

Schedule 1.1(a) ..............................................................Owned Real Property

Schedule 1.1(b) .............................................................Leased Real Property

Schedule 1.1(c) .............................................................Franchise Agreements

Schedule 1.1(h) .............................................................Designated Contracts

Schedule 1.1(o) .................................................................Acquired Vehicles

Schedule 1.2(c) ...........................................................................Rebates

Schedule 1.3(a) ..............................................................Accounts Payable

Schedule 1.3(b) ...............................................................Accrued Expenses

Schedule 2.5 ...........................................................................Allocation

Schedule 4.1(d) .......................................................................No Brokers

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of October 12, 2017 (the "**Execution Date**"), is made by and between Unique Ventures Group, LLC, a Pennsylvania limited liability company ("**Seller**"), and SFR II Holdings, LLC, a Delaware limited liability company ("**Buyer**"). Unless otherwise set forth, capitalized terms used in this Agreement are defined or cross-referenced in Article X.

### RECITALS

WHEREAS, on February 13, 2017 (the "**Petition Date**"), Seller commenced voluntary cases (the "**Bankruptcy Case**") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "**Bankruptcy Court**");

WHEREAS, on March 23, 2017, the Bankruptcy Court entered an order appointing M. Colette Gibbons as the Chapter 11 Trustee (the "**Chapter 11 Trustee**") of the Seller and its bankruptcy estate (Docket No. 158);

WHEREAS, this Agreement shall constitute the Asset Purchase Agreement (as such term is defined in the Sale Procedures);

WHEREAS, Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, assign, transfer and deliver to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with sections 105, 363, 365, 1146 and all other applicable provisions of the Bankruptcy Code; and

WHEREAS, Buyer will make a deposit in an amount equal to five percent (5%) of the Purchase Price (the "**Deposit**") in accordance with Section 3.3(a).

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

### ARTICLE I.        PURCHASE AND SALE OF THE ACQUIRED ASSETS

**Section 1.1    Transfer of Acquired Assets.** At the Closing, and upon the terms and conditions set forth herein, Seller shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in, to and under the following properties, assets and rights owned by Seller free and clear of Encumbrances (other than Permitted Encumbrances) (collectively the "**Acquired Assets**"):

(a)    The real property that is listed as owned by Seller on Schedule 1.1(a) (collectively, the "**Owned Real Property**");

{6928206:17}

(b)     The real property leases that are listed on <u>Schedule 1.1(b)</u> to which Seller is a party, to the extent assignable and transferable, including all Leasehold Improvements thereon (collectively, the "**Real Property Leases**");

(c)     The franchise agreements between Seller and Franchisor that are listed on <u>Schedule 1.1(c)</u> (collectively, the "**Franchise Agreements**");

(d)     Except as otherwise excluded under <u>Section 1.2</u>, all machinery, equipment, furniture, fixtures, office equipment, computer hardware and other related tangible personal property owned or leased by Seller at the Acquired Restaurants, and all warranties and licenses of Seller thereunder or related thereto;

(e)     All prepaid expenses of Seller relating to the Acquired Restaurants ("**Prepaid Expenses**");

(f)     All deposits paid by Seller related to or arising from the Acquired Assets at the Acquired Restaurants, including, without limitation, any deposits under the Real Property Leases ("**Acquired Deposits**"), but excluding the Utility Deposits;

(g)     All advertising and promotional materials and any rights thereto possessed, or entitled to be used, by Seller;

(h)     The Contracts that are listed on <u>Schedule 1.1(h)</u> to which Seller is a party, to the extent assignable and to which Buyer elects to take assignment of at or before the Closing in accordance with the process described in <u>Section 1.6</u> (collectively, the "**Designated Contracts**");

(i)     All Inventory on-hand at the Acquired Restaurants;

(j)     All permits, authorizations and licenses (collectively, the "**Permits**") issued to Seller by any Government with respect to the Acquired Restaurants, to the extent assignable;

(k)     Except as otherwise excluded under <u>Section 1.2(f)</u>, all insurance benefits, rights and proceeds arising from or relating to any event or incident that effects, impacts or alters any Acquired Asset between the Execution Date and the Closing Date;

(l)     Except as otherwise excluded under <u>Section 1.2</u>, all rights, claims, rights of offset, causes of action, lawsuits, judgments and other claims or demands of any nature against any third party arising out of, and only with respect to, the Acquired Assets or Assumed Liabilities;

(m)     All books, files and records held or otherwise owned by Seller that relate to current or former employees and other personnel employed at the Acquired Restaurants, including, without limitation, books, files and records that are related to medical history, medical insurance or other medical matters and to workers' compensation and to the evaluation, appraisal or performance of current or former employees and other personnel of Seller (collectively, the "**Employee Records**");

(n)     Copies of all books, files and records of sales and general business operations, and Seller's supplier lists at the Acquired Restaurants; and

(o)     All vehicles owned by Seller that are listed on Schedule 1.1(o) (collectively, the "**Acquired Vehicles**").

**Section 1.2     Excluded Assets.**     Notwithstanding anything to the contrary in this Agreement, Seller shall retain its right, title and interest in, to and under all of its properties, assets and rights not otherwise an Acquired Asset (collectively, the "**Excluded Assets**"), and:

(a)     All of Seller's cash and cash equivalents, including any cash on hand at the Acquired Restaurants as of the Closing Date;

(b)     All trade accounts receivable and credit card receivables of Seller in existence as of the Closing Date (collectively, the "**Accounts Receivable**");

(c)     All amounts and funds (rebates and dividends) on account of, accrued by or due from vendors, including the vendors set forth on Schedule 1.2(c) to Seller pursuant to any agreement or arrangement for all periods prior to the Closing (collectively, the "**Rebates**");

(d)     All equity ownership interests in Seller;

(e)     All rights to refunds of or credits for Taxes of Seller previously paid by Seller prior to the Closing Date, and any records relating to Taxes of Seller;

(f)     all insurance policies, contracts and coverage obtained by Seller and all rights to insurance proceeds or other Contracts of insurance or indemnity (or similar agreement) recoveries relating to the Excluded Assets; provided, however, all insurance proceeds relating to the Brooklyn, Ohio location received by Seller shall be an Excluded Asset;

(g)     All avoidance claims and causes of action arising under Chapter 5 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds from any of the foregoing;

(h)     All rights of and benefits to Seller under this Agreement, the Ancillary Agreements or any other agreements or instruments otherwise delivered, executed or made in connection with this Agreement;

(i)     The Contracts to which Seller is a party that is not an Acquired Contract and all deposits, claims, rebates or refunds thereunder or related thereto (collectively, the "**Excluded Contracts**");

(j)     All utility deposits paid by Seller prior to the Closing Date and all rights to the refund of all or any portion thereof ("**Utility Deposits**");

(k)     All Employee Benefit Plans;

(l)     Corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of Seller or required to be retained by Seller pursuant to applicable law;

(m)     All of Seller's equity interests in CBK Futures, Inc., an Ohio corporation;

(n)     Any amounts due under any and all Promissory Note and/or Promissory Notes due from Damon's Restaurants, Inc. and/or its affiliates;

(o)     All of Seller's ownership or rights with respect to property, intellectual property and/or franchise rights sold to Seller by Damon's International, Inc., Damon's Restaurants, Inc., and/or Damon's Management, Inc. as more described in the Asset Purchase Agreement attached as <u>Exhibit A</u> to that certain Order Authorizing the Sale of Substantially All Remaining Assets Free and Clear of All Liens, Claims, and Encumbrances and for Assumption and Assignment of Franchise Agreements entered on January 9, 2014 by the United States Bankruptcy Court for the Western District of Pennsylvania in Chapter 11 Case No. 09-27920-JAD, Docket No. 1697; and

(p)     All assets of Seller located at 348 West Main Street, Conneaut, OH 44030, including the cash on hand, related real property lease and all machinery, equipment, furniture, fixtures, office equipment, computer hardware and other related tangible personal property owned or leased by Seller at such location, and all warranties and licenses of Seller thereunder or related thereto.

     **Section 1.3**    <u>**Assumption of Liabilities.**</u> At the Closing, Buyer shall assume, and thereafter pay, perform and discharge when due, the following liabilities of Seller (collectively, the "**Assumed Liabilities**"):

(a)     The Prorated Amounts that relate to any time period up to, but not including, the Closing Date as described in Section 2.3;

(b)     The obligation to pay all invoices relating to food inventory orders made by the Seller within seven (7) days prior to the Closing Date; provided, that, Buyer has the opportunity to review and consent to such orders prior to being placed by the Seller;

(c)     All liabilities and obligations under the Acquired Contracts (defined below), including, without limitation, (i) all pre-petition cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Acquired Contracts (such pre-petition cure costs are, collectively, the "**Cure Costs**"); and (ii) the liability and obligations pursuant to the transfer provisions of the Franchise Agreements, whether such liability or obligation is set forth in the Franchise Agreements as the responsibility

of Franchisee (as defined in the Franchise Agreements) or the transferee thereunder;

(d)     All accrued but unpaid real estate and personal property Taxes related to the Acquired Restaurants, and other related assessments and fees, if any, related to or arising from the ownership of the Acquired Assets at the Acquired Restaurants (collectively, the "**Property Taxes**"); and

(e)     Those liabilities and obligations assumed by or made the responsibility of Buyer as set forth elsewhere in this Agreement.

**Section 1.4     Excluded Liabilities.**  Notwithstanding anything to the contrary in this Agreement, Seller shall retain, and remain liable and obligated for any of its respective liabilities not otherwise included in the Assumed Liabilities (collectively, the "**Excluded Liabilities**"), including, without limitation:

(a)     Any liability arising from or related to the Excluded Assets, including, without limitation, the Excluded Contracts;

(b)     All Employee Benefit Plan liabilities and obligations;

(c)     Any liability for income, franchise, sales, or similar Taxes arising out of or resulting from Seller's operations prior to the Closing Date;

(d)     Any liability arising from contract rejection damages for Contracts or Real Property Leases not assumed; and

(e)     Any liability relating to (A) events or conditions occurring or existing in connection with, or arising out of, the business as operated on or prior to the Closing Date, or (B) the ownership, rise, possession, operation or sale or other disposition on or prior to the Closing Date of any Acquired Assets (or any other assets, properties, rights or interests asserted, at any time on or prior to the Closing Date, of the business).

**Section 1.5     Post-Closing Liabilities.**  Buyer acknowledges that Buyer shall be responsible for all liabilities and obligations relating to Buyer's ownership or use of, or right to use, the Acquired Assets and the Assumed Liabilities after the Closing Date, including, without limitation, all Taxes arising out of or related to the Acquired Assets or the operation of conduct of the business acquired pursuant to this Agreement for all Tax periods beginning on or after the Closing Date.

**Section 1.6     Assumption and Assignment of Designated Contracts.**

(a)     Not later than one (1) Business Days prior to the deadline for all parties in interest to submit bids for the Acquired Assets as set forth in the Sale Procedures Order (the "**Contract Designation Date**"), Seller and Buyer agree to work together to create Schedule 1.1(h) to identify all of the Designated Contracts that Buyer elects to assume (in its sole discretion) (such elected Designated Contracts, together, with the Real Property Leases and Franchise

Agreements, collectively, the "**Acquired Contracts**") and that Seller will assign to Buyer at Closing. Appropriate additions to Schedule 1.1(h) shall be made to reflect such elections made by Buyer. Schedules 1.1(b), 1.1(c) and 1.1(h) shall also (A) set forth the amounts necessary to cure any defaults under each of the Acquired Contracts as determined by Seller based on Seller's books and records or as otherwise determined by the Bankruptcy Court, and (B) delineate a procedure for transferring to Buyer the rights to any security deposits with the other party to any Acquired Contract. Upon the Closing, all the Designated Contracts remaining on Schedule 1.1(h), the Real Property Leases and the Franchise Agreements shall be Acquired Contracts, as the case may be, for purposes of this Agreement. For the avoidance of doubt, Buyer may not elect to delete or exclude any Real Property Lease or Franchise Agreement from the Acquired Contracts.

(b)    If, at any time after the earlier of (i) the date hereof through the ninetieth (90th) day after the Closing Date, or (ii) the date (A) the Bankruptcy Case is converted to a Chapter 7 case or (B) an order is entered approving or confirming a plan of liquidation in the Bankruptcy Case, any party to this Agreement becomes aware that Seller is a party to any Contract or Real Property Lease related to the business that is not an Excluded Asset and is not disclosed on Schedules 1.1(b) and 1.1(h) (each, an "**Undisclosed Contract**"), the discovering party shall promptly notify the other parties in writing (the "**Notification**") of such Undisclosed Contract. For a period of thirty (30) days after the date of Buyer's receipt or delivery, as the case may be, of the Notification, Buyer shall have the right, in its sole discretion, to require Seller to file one or more motions with the Bankruptcy Court (which motion(s) shall be in form and substance reasonably satisfactory to Buyer) seeking the entry of an order (the "**Undisclosed Contract Assignment Order**"), pursuant to Sections 363 and 365 of the Bankruptcy Code, to assign, transfer, convey and deliver to Buyer such Undisclosed Contract as if it had been disclosed on Schedules 1.1(b) and 1.1(h), or to otherwise transfer the benefits of such Undisclosed Contract to Buyer without any additional consideration (other than the payment by Buyer of the Cure Costs, if any, associated with such Undisclosed Contract). In the event that Buyer notifies Seller of Buyer's desire to assume any Undisclosed Contract, Seller shall, as soon as practicable after receiving such notification, file with the Bankruptcy Court the motion(s) seeking the entry of the Undisclosed Contract Assignment Order. Seller shall not take any action that would reasonably be expected to delay, prevent or impede the entry of, or result in the revocation, modification or amendment of, the Undisclosed Contract Assignment Order. Any Undisclosed Contract that Buyer elects to assume pursuant to Schedules 1.1(b) and 1.1(h) and for which an Undisclosed Contract Assignment Order is entered shall constitute an Acquired Asset.

(c)    The Sale Order shall provide that, as of the Closing, Seller shall (i) assume the Acquired Contracts in the Bankruptcy Case and (ii) assign the Acquired Contracts to Buyer.

(d)    Notwithstanding anything to the contrary herein, this Agreement shall not constitute an agreement to assign or transfer any interest in any Acquired Contract or any claim or right arising thereunder if such assignment or transfer without the approval of a third party would constitute a breach thereof or affect adversely the rights of Buyer thereunder (after giving effect to the Sale Order and the Bankruptcy Code), and any such transfer or assignment shall be made subject to such approval being obtained. In the event any such approval is not obtained prior to Closing, Seller shall continue its reasonable best efforts to obtain any such approval after Closing, and Seller will cooperate with Buyer in any lawful and economically feasible

{6928206:17}                                              6

arrangement to provide that Buyer shall receive the interest of Seller in the benefits under any such Acquired Contract, including performance by Seller as agent, <u>provided,</u> that Buyer shall undertake to pay or satisfy the corresponding liabilities for the enjoyment of such benefit to the extent Buyer would have been responsible therefor if such Approval had been obtained.

## ARTICLE II.    <u>CONSIDERATION</u>

**Section 2.1    <u>Purchase Price</u>.** The aggregate consideration for the Acquired Assets shall be: (a) an amount in cash equal to $2,868,000 (the "**Purchase Price**"); (b) *plus* the Seller's Proration Amount, if any, or *less* the Buyer's Proration Amount, if any, as determined pursuant to Section 2.6, *plus* (c) the assumption by Buyer of the Assumed Liabilities (such assumption, together with the Final Purchase Price, the "**Total Consideration**"). For the avoidance of doubt, no items included in the definitions of Assumed Liabilities and Proration Amount shall be double counted for purposes of calculating the Purchase Price.

**Section 2.2    <u>Payment of Cure Costs</u>.** On or before the Closing, Buyer shall pay any Cure Costs as determined by the Bankruptcy Court in the Sale Order directly to the appropriate counterparties to the Acquired Contracts; <u>provided, however</u>, that in the event any such cure amount remains the subject of a dispute at the Closing Date, Buyer shall pay any such cure amount upon the entry of an order of the Bankruptcy Court settling such dispute.

**Section 2.3    <u>Prorations</u>.** Seller shall calculate, in good faith, prorated amounts (the "**Proration**") for (a) rent and related charges under the Real Property Leases, (b) Prepaid Expenses, (c) Property Taxes, (d) charges for sewer, water, fuel, telephone, electricity and other utilities, and (e) Rebates (items (a) through (e) together, the "**Prorated Amounts**"), as of the Closing Date. For purposes of calculating the Proration, Seller shall be liable to the extent the Prorated Amounts relate to any time period up to, but not including, the Closing Date, and Buyer shall be liable to the extent the Prorated Amounts relate to periods including and following the Closing Date. Seller shall provide Buyer the Proration, and reasonable supporting documentation, at least two (2) days prior to the Closing Date. The Proration shall be based on the latest available rates, valuations, readings, or such other information or documents that most accurately reflect current charges or accrued amounts for the Prorated Amounts. Notwithstanding that the Proration may contain Seller's good faith estimates to prorate one or more of the Prorated Amounts, the Proration shall be final, unless based on materially incorrect information. The Purchase Price shall be (i) increased by the net amount of the Proration if such amount is in Seller's favor ("**Seller's Proration Amount**"), and (ii) decreased by the net amount of the Proration if such amount is in Buyer's favor ("**Buyer's Proration Amount**").

**Section 2.4    <u>Transaction Taxes</u>.** All Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets and all recording and filing fees (collectively, "**Transaction Taxes**"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets and that are not exempt under section 1146(a) of the Bankruptcy Code, shall be borne by Buyer. Buyer and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement; (b) provide all requisite exemption certificates; and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate Government taxing authorities.

{6928206:17}

**Section 2.5**    **Allocation of Purchase Price.**   Buyer and Seller shall allocate the Total Consideration among the Acquired Assets in accordance with Schedule 2.5 (the "**Allocation**"). The Allocation will be binding upon Buyer and Seller and their respective successors and assigns, and none of the parties to this Agreement will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation.  Buyer and Seller will report the purchase and sale of the Acquired Assets on all tax returns, including, without limitation, Form 8594 as provided for in section 1060 of the Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Forms 8594.

## ARTICLE III.    CLOSING AND DELIVERIES

**Section 3.1**    **Closing.**   The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place on the first (1st) Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article VI or on such other date or at such other time as may be mutually agreed to by the parties (the "**Closing Date**") and shall be effective as of 12:01 a.m. Eastern Standard Time on the Closing Date. Subject to such different procedures agreed upon by the parties, the Closing shall take place via a "paper" close wherein Buyer and Seller shall exchange such documents and instruments or copies thereof sufficient to effect the Closing by electronic or other means without the use of a "roundtable" closing at a particular location.  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

**Section 3.2**    **Seller's Deliveries.**   Seller shall deliver to Buyer at or prior to the Closing or such other time as set forth:

(a)    A bill of sale for all of the Acquired Assets that are tangible personal property, without representation, warranty or covenant of any kind;

(b)    An agreement for the assumption of the Assumed Liabilities, without representation, warranty or covenant of any kind;

(c)    For the Owned Real Property, if any, a recordable quit-claim deed;

(d)    For all intangible Acquired Assets, including all Acquired Contracts, (i) an agreement of assignment and assumption, without any representation, warranty or covenant of any kind, or (ii) an order of the Bankruptcy Court effecting the same;

(e)    A certificate, dated the Closing Date, signed by the Trustee, certifying to the accuracy of the matters set forth in Section 5.1(a); and

(f)    Such other agreements, documents or instruments of assignment and transfer that Buyer may reasonably request; the form and substance of which are acceptable to Seller.

**Section 3.3**    **Buyer's Deliveries.**   Buyer shall deliver to Seller at or prior to the Closing or such other time as set forth:

(a)     The Purchase Price, as follows: (i) the Deposit, by wire transfer of immediately available funds within ten (10) Business Days of the Execution Date to an account specified in writing by Seller, or by the Bankruptcy Court, as the case may be; and (ii) the remaining balance of the Purchase Price, by wire transfer of immediately available funds on or before the Closing Date to an account specified in writing by Seller;

(b)     A duly executed counterpart of Buyer to each of the documents listed in Section 3.2(b) and 3.2(d);

(c)     A certificate, dated the Closing Date, signed by its Secretary, certifying the accuracy of the matters set forth in Section 5.2(a); and

(d)     Such other agreements, documents or instruments of assignment and transfer that Seller may reasonably request; the form and substance of which are acceptable to Buyer.

## ARTICLE IV.     REPRESENTATIONS AND WARRANTIES

**Section 4.1     Representations and Warranties of Seller.**  Seller hereby represents and warrants to Buyer as of the Execution Date as follows:

(a)     Authorization and Validity.  Subject to the Bankruptcy Court's entry of the Sale Order, (i) Seller has all requisite power and authority to enter into this Agreement and any Ancillary Agreements to which Seller is a party and to perform its obligations hereunder and thereunder; and (ii) this Agreement constitutes Seller's valid and binding obligation, enforceable against Seller in accordance with its respective terms.

(b)     No Conflict or Violation.  The execution, delivery and performance by Seller of this Agreement and any Ancillary Agreement to which Seller is a party does not violate or conflict with any provision of Seller's articles or organization or operating agreement or similar organizational documents.

(c)     Title to Assets.  Seller owns, and has good, valid, and marketable title to, all of the Acquired Assets.  At the Closing, Seller will transfer title to all the Acquired Assets free and clear of all Encumbrances as set forth in the Sale Order.

(d)     No Brokers.  Except as set forth on Schedule 4.1(d), neither Seller nor any Person acting on behalf of Seller has paid or become obligated to pay any fee or commission to any other broker, finder or intermediary for or on account of the transactions contemplated under this Agreement.

**Section 4.2     Representations and Warranties of Buyer.**  Buyer hereby represents and warrants to Seller as of the Execution Date as follows:

(a)     Corporate Organization. Buyer is a Delaware limited liability company duly organized, validly existing and in good standing under the laws of the State of

Delaware and has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

(b)     <u>Qualification to Conduct Business</u>.  Buyer is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business conducted by it makes such qualification necessary.

(c)     <u>Authorization and Validity</u>.  Buyer has all requisite corporate power and authority to enter into this Agreement and any Ancillary Agreement to which Buyer is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and any Ancillary Agreement to which Buyer is a party and the performance of Buyer's obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate action of Buyer, and no other corporate proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance.    This Agreement has been, and any Ancillary Agreement to which Buyer is a party has been duly executed by Buyer and constitutes Buyer's valid and binding obligations, enforceable against it in accordance with their respective terms.

(d)     <u>No Conflict or Violation</u>.  The execution, delivery and performance by Buyer of this Agreement and any Ancillary Agreement to which Buyer is a party does not (i) violate or conflict with any provision of Buyer's certificate of incorporation or bylaws or similar organizational documents; (ii) violate any provision of law, or any order, judgment or decree of any court or Government applicable to Buyer or any of its properties or assets; or (iii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

(e)     <u>Consents and Approvals</u>.  No consent, waiver, authorization or approval of any Person or declaration, filing or registration with any Government is required in connection with the execution and delivery by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party or the performance by Buyer of its obligations hereunder or thereunder.

(f)     <u>Adequate Assurances Regarding Acquired Contracts</u>.  Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Acquired Contracts.

(g)     <u>Litigation</u>.  There are no claims, actions, suits, proceedings or investigations pending, threatened in writing or against Buyer, or any Related Person of Buyer, that could affect the ability of Buyer to consummate the transactions contemplated by this Agreement and each Ancillary Agreement.

      (h)    <u>Adequacy of Funds</u>.  Buyer has cash on hand, existing availability under existing lines of credit, or other immediately available financial resources sufficient to pay the balance of the Purchase Price at Closing.

    **Section 4.3**    <u>**Warranties Are Exclusive.**</u>    The parties acknowledge that the representations and warranties contained in this <u>Article IV</u> are the only representations or warranties given by the parties and that all other express or implied warranties are disclaimed. Without limiting the foregoing, Buyer acknowledges that, except for the representations and warranties contained in <u>Section 4.1</u>, the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed.    WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN <u>SECTION 4.1</u>, SELLER AND ITS RELATED PERSONS AND AFFILIATES HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING ANY (A) USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, OR (C) OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS.  Buyer further acknowledges that Buyer has conducted, or has had an adequate opportunity to conduct, all necessary due diligence related to Seller's business, the Acquired Assets, the Assumed Liabilities, and all such other matters relating to or affecting any of the foregoing.  In proceeding with the transactions contemplated in this Agreement, except for any representations and warranties expressly set forth in <u>Section 4.1</u>, Buyer is doing so based solely upon its own due diligence and review, all of which has been completed to the satisfaction of the Buyer, and Buyer has not relied upon any oral or written statements, representations or guaranties whatsoever, whether express or implied, made by Seller or its agents and representatives.

## ARTICLE V.    <u>COVENANTS AND OTHER AGREEMENTS</u>

    **Section 5.1**    <u>**Covenants of Seller.**</u>  Seller covenants to Buyer that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement:

      (a)    <u>Conduct of Business Before the Closing</u>.  Unless otherwise agreed by Seller and Buyer, Seller shall use commercially reasonable efforts to conduct its business in all material respects in the manner in which it has been conducted since the Petition Date and to preserve intact its respective business or organization and relationships with third parties.    Consistent with the foregoing, except as consented to by Buyer and approved by the Bankruptcy Court as appropriate, Seller shall (i) keep and maintain the Acquired Assets in good operating condition and repair subject to normal wear and tear; (ii) use its best efforts consistent with good business practice to maintain its business intact and to preserve the goodwill of the suppliers, licensors, employees, customers, distributors and others having business relations with Seller; (iii) maintain (except for expiration due to lapse of time) all Acquired Contracts in effect without change, except those Acquired

Contracts which expire or terminate by their terms or in which the customer ceases making payments or as otherwise expressly provided herein; (iv) comply in all material respects with the provisions of all Legal Requirements applicable to Seller, the Acquired Assets and the conduct of Seller's business; (v) not alter the rate or basis of compensation of any of its officers, directors or employees other than in accordance with the orders of the Bankruptcy Court; (vi) not sell, lease or otherwise dispose of any properties or assets, except in accordance with the orders of the Bankruptcy Court and otherwise in the ordinary course of business consistent with past practice; and (vii) not enter into any Contract with any shareholder of Seller or any Affiliate of any shareholder of Seller.

(b)     Cooperation.  Seller shall use commercially reasonable efforts to (i) take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective as soon as possible the transactions contemplated hereby; and (ii) assist Buyer's efforts to transfer or obtain any Permits required to own the Acquired Assets.

(c)     Alternate Transactions.  From the Execution Date until the date of entry of the Sale Procedures Order, Seller shall not (i) execute an agreement with respect to an Alternative Transaction, or (ii) seek or support Bankruptcy Court approval of a motion or order inconsistent in any material respect with the transactions contemplated under this Agreement. Following entry of the Sale Procedures Order, Seller shall promptly (and in any event within one (1) Business Day) notify Buyer in writing at such time as any Person proposing an Alternate Transaction has been determined to be a Qualified Bidder (as defined in the Sale Procedures Order).

(d)     Confidentiality.   Seller acknowledges that it has knowledge of Confidential Information of the business and Seller.  Except to the extent disclosure is required by applicable law or Bankruptcy Court proceedings, after the Closing Date, Seller agrees to, and to cause its Affiliates to, hold the Confidential Information in the strictest confidence and agrees that it shall not disclose, make known, reveal or expose, directly or indirectly, nor directly or indirectly, use for its own benefit or for the benefit of any other Person, the Confidential Information of the business of Seller.

(e)     Notification.  From the Execution Date until the Closing Date, Seller will give Buyer prompt written notice upon becoming aware of any material development affecting the Acquired Assets, the Assumed Liabilities, Seller's business, the financial condition, operations or prospects of Seller, or any event or circumstance that could reasonably be expected to result in a breach of, or inaccuracy in, any representation or warranty contained in Section 4.1; provided, however, that no such disclosure will be deemed to prevent or cure any such breach of, or inaccuracy in, amend or supplement any Schedule to, or otherwise disclose any exception to, any of the representations and warranties of Seller set forth in this Agreement. Seller will furnish to Buyer, promptly after filing with the

{6928206:17}                                              12

Bankruptcy Court, a copy of the time stamped monthly operating report filed by Seller with the Bankruptcy Court.

**Section 5.2    Covenants of Buyer.**  Buyer covenants to Seller that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement:

(a)    Cooperation.  Buyer shall use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b)    Adequate Assurances Regarding Acquired Contracts and Required Orders.  With respect to each Acquired Contract, Buyer shall provide adequate assurance of the future performance of such Acquired Contract by Buyer.  Buyer shall promptly take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of the Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 5.3    Other Covenants.**

(a)    Improper Receipt of Payment.   From and after the Closing, (i) Seller shall promptly forward to Buyer any and all payments received by it that constitutes part of the Acquired Assets; and (ii) Buyer shall promptly forward to the Seller any and all payments received by Buyer that constitute part of the Excluded Assets.

(b)    Records.  From and after the Closing, Buyer shall provide Seller, and its agents and representatives, as the case may be, access to, reasonable means of copying, i.e., provide a copy machine, or copies of, the Employee Records for use by each Seller in any dispute, claim, action or controversy regarding any employee matter, and permit Seller to either make copies or, as may be necessary to fully comply with any law, regulation or court mandate, borrow the original Employee Records for such time as may be reasonably needed by Seller.  Buyer shall provide Seller at least ninety (90) days written notice prior to the destruction or permanent deletion of any Employee Records, upon which Seller may consent to such destruction, request copies, or obtain possession of such Employee Records, or any combination thereof, by written notice delivered to Buyer before the expiration of such ninety (90) day period.

(c)    Employee Matters.  Immediately prior to the Closing, Seller shall terminate the employment of all employees of Seller.  At or prior to the Closing, Seller agrees that Buyer may, at its option, accept applications for employment from any or all such employees previously employed by Seller, which applications shall include privacy releases authorizing Seller to release to Buyer each such employee's personnel records.  For the avoidance of doubt, Buyer shall have no obligation to

employ or offer employment to any of Seller's employees.    Under no circumstances shall Buyer assume or be obligated to pay, and the Acquired Assets shall not be or become liable for or subject to, any claims of Seller's employees, including but not limited to, any claims or liabilities related to employment practices, COBRA for Seller employees not hired by Buyer, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour Legal Requirements, any other state, federal or local labor and employment Legal Requirements, Liability under the WARN Act, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension, profit sharing, retirement and/or deferred compensation and any other compensation or benefits for any period prior to the Closing Date (the "**Employee Claims**"), which Employee Claims shall be and remain the liability, responsibility and obligations of Seller.

**Section 5.4**    **Bankruptcy Matters; Bidding Process.**

(a)    Seller and Buyer acknowledge that this Agreement and the Transactions are subject to Bankruptcy Court approval.

(b)    Five (5) business days after the Execution Date, Seller shall file with the Bankruptcy Court motions (the "**Sale Motions**"), notices and proposed orders, each in form and substance reasonably satisfactory to Buyer, seeking the Bankruptcy Court's issuance of:

(i)    an order approving the process respecting the sale of the Acquired Assets in substantially the form attached as Exhibit 5.4(b)(i) (to be provided no later than sixty (60) days following the filing of the Sale Motions) (the "**Sale Procedures Order**"), and

(ii)    an order approving this Agreement in substantially the form attached as Exhibit 5.4(b)(ii) (to be provided no later than ninety (90) days following the filing of the Sale Motions) (the "**Sale Order**").

(c)    Seller shall serve a copy of the Sale Motions on: (i) all Persons that claim any interest in or Encumbrance upon the Acquired Assets, (ii) all parties to Acquired Contracts, (iii) all Governmental Authorities with taxing power that have, or as a result of the sale of the Acquired Assets may have, claims, contingent or otherwise, against Seller, (iv) all Persons that file requests for notices under Bankruptcy Rule 9010(b) or are entitled to notice under Bankruptcy Rule 2002, (v) the twenty (20) largest unsecured creditors (whether liquidated, contingent or unmatured) of Seller, (vi) all interested Governmental Authorities, (vii) the Office of the United States Trustee, and (viii) all Persons that expressed to Seller an interest in purchasing the Acquired Assets since March 23, 2017.

(d)    Seller shall use its reasonable best efforts to provide Buyer with a copy of the Sale Motions or any motion to approve the Sale Procedures Order (including any related forms of orders and notices to interested Persons) at least two (2) Business

Days (unless the exigencies of time prevent the period from being that long) prior to the filing thereof in the Bankruptcy Case so as to allow Buyer to provide reasonable comments for incorporation into same.

(e)     Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining the Sale Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code.

## ARTICLE VI.    CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

**Section 6.1     Conditions Precedent to Performance by Seller.**    The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 6.1(c), may be waived by Seller, in its discretion:

(a)     Representations and Warranties of Buyer.    The representations and warranties of Buyer made in Section 4.2 of this Agreement, in each case, shall be true and correct in all material respects as of the Execution Date and as of the Closing as though made by Buyer as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date.

(b)     Performance of the Obligations of Buyer.    Buyer shall have performed in all material respects all obligations required under this Agreement and any Ancillary Agreement to which Buyer is party to be performed by Buyer on or before the Closing.

(c)     Higher and Better Offer; Governmental Consents and Approvals.    The Seller has held an auction to entertain higher and better offers for the sale of the Acquired Assets, and the Bankruptcy Court shall have entered the Sale Order, the Sale Order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

(d)     Closing Deliveries.    Buyer shall have made the deliveries contemplated under Section 3.3.

**Section 6.2     Conditions Precedent to the Performance by Buyer.**    The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 6.2(c), may be waived by Buyer, in its discretion:

(a)     Representations and Warranties of Seller.    The representations and warranties of Seller made in Section 4.1 of this Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made by Seller as of the Closing Date, except to the extent such representations

and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date.

(b)    <u>Performance of the Obligations of Seller</u>.  Seller shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which Seller is a party to be performed by Seller on or before the Closing Date.

(c)    <u>Governmental Consents and Approvals</u>.  Bankruptcy Court shall have entered the Sale Order, the Sale Order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

(d)    <u>Closing Deliveries</u>.  Seller shall have made the deliveries contemplated under <u>Section 3.2</u>.

## ARTICLE VII.    <u>TERMINATION</u>

**Section 7.1    <u>Conditions of Termination by Buyer Prior to the Specified Date</u>.**  This Agreement may be terminated by Buyer by 5:00PM eastern standard time on the date that is three (3) Business Days prior to the hearing date on the Sale Procedures Order set by the Bankruptcy Court (the "**Specified Date**") by providing written notice to Seller of its election to terminate this Agreement (the "**Specified Notice**") if (a) Buyer is not satisfied with the results of its due diligence (including, without limitation, the quality of earnings report to be prepared by Buyer's advisors) in its reasonable discretion or (b) Buyer is not satisfied with <u>Schedule 2.5</u>, to be supplemented by the Seller prior to the Specified Date.  Buyer will be deemed to have waived its right to terminate this Agreement pursuant to this <u>Section 7.1</u> if it does not deliver the Specified Notice by 5:00PM eastern standard time on the Specified Date.

**Section 7.2    <u>Conditions of Termination at Any Time Prior to Closing</u>.**  This Agreement may be terminated only in accordance with this <u>Article VII</u>.  This Agreement may be terminated at any time before the Closing as follows:

(a)    By mutual consent of Seller and Buyer;

(b)    By Seller, by notice to Buyer, if Seller has provided Buyer with notice of any inaccuracy of any representation or warranty contained in <u>Section 4.2</u>, or of a failure to perform any covenant or obligation of Buyer contained in this Agreement or any Ancillary Agreement to which Buyer is party, and Buyer has failed, within three (3) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Seller of Buyer's ability to remedy such inaccuracy or perform such covenant or obligation; <u>provided</u>, <u>however</u>, that Seller shall not have the right to terminate this Agreement under this <u>Section 7.2(b)</u> if Seller is then in material breach of this Agreement;

(c)      By Seller, if the Bankruptcy Court dismisses the Seller's chapter 11 case or converts the chapter 11 case to a case under chapter 7 of the Bankruptcy Code; if the Bankruptcy Court confirms a chapter 11 plan in the Seller's chapter 11 case; or if the Bankruptcy Court appoints an examiner with expanded powers;

(d)      By Buyer, by notice to Seller, if Buyer has previously provided Seller with notice of any material inaccuracy of any representation or warranty of Seller contained in Section 4.1 or a material failure to perform any pre-Closing covenant of Seller contained in this Agreement or any Ancillary Agreement to which Seller is a party, either of which would have a material adverse effect upon the Acquired Assets after Closing, and Seller has failed, within three (3) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Seller's ability to remedy such inaccuracy or perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 7.2(d) if Buyer is then in material breach of this Agreement; and

(e)      By Buyer, in the event Franchisor exercises any right of first refusal or similar option or right with respect to the Acquired Restaurants;

(f)      Automatically, upon the consummation of an Alternative Transaction;

(g)      By Buyer prior to the Bid Deadline, in the event that (i) Buyer is not satisfied with the amendments to the terms of the applicable Real Property Leases with Spirit in its reasonable discretion; and (ii) Buyer is not satisfied with the remodel schedule with Franchisor in its reasonable discretion.

(h)      By Buyer in the event the Bankruptcy Court issues a Sale Order in a form that materially differs from the form of Sale Order attached as Exhibit 5.4(b)(ii).

(i)      By Buyer in the event the Bankruptcy Court does not approve this Agreement as the "stalking horse" Purchase Agreement pursuant to the Sale Procedures Order.

**Section 7.3**      **Effect of Termination; Remedies.**

(a)      In the event of termination pursuant to Section 7.1 or Section 7.2, this Agreement shall become null and void and have no effect (other than Article VII, Article VIII and Article IX, which shall survive termination), with no liability on the part of Seller, Buyer, or their respective Affiliates or respective Related Persons, with respect to this Agreement or any Ancillary Agreement, except for any liability provided for in this Article VII.

(b)      If this Agreement is terminated pursuant to Section 7.1, Section 7.2(a), 7.2(c), 7.2(d) or 7.2(i) then, within five (5) Business Days after such termination, the Deposit shall be returned to Buyer, without interest.

(c)    If this Agreement is terminated pursuant to <u>Section 7.2(b)</u> then all right, title and interest to the Deposit shall automatically vest in Seller, and Seller may pursue any and all other remedies at law.

(d)    If this Agreement is terminated pursuant to <u>Section 7.2(e)</u> or <u>Section 7.2(f)</u> then, subject to the approval of the Bankruptcy Court, (i) the Deposit shall be returned to Buyer, without interest, within five (5) Business Days; and (ii) Seller shall pay to Buyer the Buyer's reasonable transaction expenses related to the negotiation, execution and performance of this Agreement up to a maximum of $100,000 ("**Buyer Expenses**"), as evidenced in writing to Seller in reasonable detail and approved by the Bankruptcy Court.  Any payments of the Buyer Expenses under this <u>Section 7.3(d)</u> shall be made by Seller from the proceeds of the Alternative Transaction or from the proceeds of the exercise of the right of first refusal, by wire transfer of immediately available funds to an account designated in writing by Buyer within five (5) Business Days from the closing of such Alternative Transaction.

(e)    Notwithstanding anything contained herein to the contrary, if this Agreement is terminated pursuant to <u>Section 7.2(g)</u> or <u>Section 7.2(h)</u>, then, subject to the approval of the Bankruptcy Court (i) the Deposit shall be returned to Buyer within five (5) Business Days and (ii) if an Alternative Transaction is consummated, Seller shall pay to Buyer the Buyer Expenses.  Any payments of the Buyer Expenses under this <u>Section 7.3(e)</u> shall be made by Seller from the proceeds of the Alternative Transaction to an account designated in writing by Buyer within five (5) Business Days from the closing of such Alternative Transaction.

(f)    Seller acknowledges that Buyer Expenses (or any portion thereof) are necessary and appropriate expenses for the administration of its estate, pursuant to sections 503 and 507 of the Bankruptcy Code, and that the Buyer Expenses (or any portion thereof) are allowed administrative expenses against its estate subject to Bankruptcy Court approval.

**Section 7.4    Exclusive Remedy; Waiver.** Prior to the Closing, the parties' sole and exclusive remedies for any claim arising out of or in connection with this Agreement shall be termination in accordance with, and obtaining the remedies provided in, this <u>Article VII</u>.  The failure by either Seller or Buyer to pursue or foreclose on any right or remedy against the other party, by itself, shall not constitute a waiver, and any waiver under this <u>Article VII</u> shall be effective only if made in writing.

## ARTICLE VIII.  SURVIVAL AND INDEMNIFICATION

**Section 8.1    Survival; Indemnification.**  None of the representations and warranties of Seller and of Buyer made in this Agreement shall survive the Closing Date, and all of such representations and warranties shall be extinguished by the Closing.  All covenants and agreements of the parties contained in this Agreement shall survive the Closing, unless otherwise expressly stated therein.  Seller shall have no monetary obligation to Buyer for breach of any covenant or agreement except under the covenant set forth in <u>Section 7.2(d)</u>.  If the Closing

occurs, Buyer shall indemnify and hold harmless Seller and its respective Affiliates and Related Persons against any and all losses, liability, expense or damage that result from or arise out of the Assumed Liabilities, and shall promptly pay such Assumed Liabilities as they become due and payable.

**Section 8.2    Specific Performance.**  Buyer acknowledges that in case of any breach of its respective covenants after the Closing, Seller would suffer immediate and irreparable harm, which money damages would be inadequate to remedy, and accordingly, in case of any such breach Seller shall be entitled to obtain specific performance.

## ARTICLE IX.    MISCELLANEOUS

**Section 9.1    Allowed Administrative Expenses.**    Subject to approval of the Bankruptcy Court, any and all amounts owed to Buyer by Seller hereunder or under any Ancillary Agreement after the Execution Date shall constitute allowed administrative expenses of the Seller under sections 503(b)(1) and 507(A)(1), as applicable, of the Bankruptcy Code.

**Section 9.2    Alternative Transaction.**  Notwithstanding anything herein or in any Ancillary Agreement to the contrary, Seller may furnish information concerning Seller, the Acquired Assets and the Assumed Liabilities to any Person in connection with a potential Alternative Transaction and negotiate, enter into and consummate an Alternative Transaction.

**Section 9.3    Further Assurances.**    At the request and the sole expense of the requesting party, Buyer or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Buyer or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

**Section 9.4    Successors and Assigns.**  This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the parties hereto.

**Section 9.5    Governing Law; Jurisdiction.**    This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Pennsylvania (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

**Section 9.6    Expenses.**  Except as otherwise provided in this Agreement, Seller and Buyer shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.

**Section 9.7    Severability.**  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this

Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as set forth on the Execution Date.

**Section 9.8**    **Notices.**

(a)    All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day of transmission, if sent via facsimile transmission to the facsimile number given below or by electronic mail to the electronic mail address given below; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given; or (iv) on the fifth (5th) day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

M. Colette Gibbons, Chapter 11 Trustee
Ice Miller, LLP
600 Superior Avenue East, Suite 1701
Cleveland, OH 44114
Email: Colette.gibbons@icemiller.com
Facsimile: 216.621.6502

With a copy to (which shall not constitute notice):

McDonald Hopkins LLC
600 Superior Avenue, E., Suite 2100
Cleveland, OH 44114
Attention:  Scott N. Opincar, Esq. and Christal L. Contini, Esq.
Email: sopincar@mcdonaldhopkins.com and ccontini@mcdonaldhopkins.com
Facsimile:  216.348.5474

If to Buyer, all notice shall be directed to legal counsel below, and notice to such legal counsel shall constitute notice to Buyer for all purposes under this Agreement:

Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P.
Wells Fargo Capitol Center
150 Fayetteville Street, Suite 2300
Raleigh, NC 27601
Attention: Bart Norman
Facsimile: 919.821.6800
Email: bnorman@smithlaw.com

(b)     Any party may change its address, facsimile number or email address for the purpose of this Section 9.8 by giving the other parties written notice of its new address in the manner set forth above.

**Section 9.9     Amendments; Waivers.**   This Agreement may only be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may only be waived, by a written instrument executed by Buyer and Seller, or in the case of a waiver, by the party waiving compliance.   Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

**Section 9.10     Public Announcements.**   Promptly after the Closing, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein.   Except as provided in the foregoing sentence, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without first coordinating their communications strategy with the other party, unless a press release or public announcement is required by law, the rules of any stock exchange, or is permitted by, or required by an order of, the Bankruptcy Court.   If any such announcement or other disclosure is required by law, the rules of any stock exchange or is permitted by, or required by an order of, the Bankruptcy Court, the disclosing party shall use reasonable efforts to give the non-disclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure; provided, there shall be no liability to the disclosing party for failure to notify the other party.   The parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and that Franchisor may provide or release its own press release or announcement without the consent or input of either Buyer or Seller.

**Section 9.11     Entire Agreement.**   This Agreement and the Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.   The Recitals and all Exhibits and Schedules hereto and any documents and instruments delivered pursuant to any provision

hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

**Section 9.12   No Third Party Beneficiaries.**   Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns.   Nothing in this Agreement is intended to or shall relieve or discharge the obligator or liability of any third Persons to Seller or to Buyer.   This Agreement is not intended and shall not give any third Persons any right of subrogation or action over or against Seller or Buyer.

**Section 9.13   Headings.**   The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**Section 9.14   Counterparts; Delivery.**   This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute the same agreement.   The signature of any of the parties may be delivered and made by facsimile, portable document format ("**pdf**") or other electronic means capable or creating a printable copy, and each such signature shall be treated as original signatures for all purposes.

**Section 9.15   Construction.**   Any reference to any law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.   The word "including" shall mean "including without limitation", whether or not it is in fact followed by those words or words of like import.   Any reference to the singular in this Agreement shall also include the plural and vice versa.   The phrase "to which Seller is a party," or similar construction, is intended to limit the applicable listing of any items, properties, assets, or Contracts to only those items that a Seller actually owns or to which Seller is actually a party, as the case may be, and is meant to exclude any listed property or Contract otherwise.

**Section 9.16   Bulk Sales.**   Buyer waives compliance with any laws governing bulk sales, including any applicable provisions of the Uniform Commercial Code.

## ARTICLE X.   DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

"**Accrued Expenses**" has the meaning set forth in <u>Section 1.3(b)</u>.

"**Accounts Payable**" has the meaning set forth in <u>Section 1.3(a)</u>.

"**Accounts Receivable**" has the meanings set forth in <u>Section 1.2(b)</u>.

"**Acquired Assets**" has the meaning set forth in <u>Section 1.1</u>.

"**Acquired Contracts**" has the meaning set forth in <u>Section 1.6(a)</u>.

"**Acquired Deposits**" has the meaning set forth in <u>Section 1.1(f).</u>

"**Acquired Restaurants**" means all Perkins restaurants located on the Leased Real Property and Owned Real Property.

"**Acquired Vehicles**" has the meaning set forth in Section 1.1(o).

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such Person.

"**Agreement**" has the meaning set forth in the Preamble.

"**Allocation**" has the meaning set forth in Section 2.5.

"**Alternative Transaction**" means any transaction (regardless of the form thereof) involving a sale of all or any substantial portion of the Acquired Assets by Seller to a purchaser or purchasers other than Buyer; provided, that such transaction is undertaken pursuant to section 363 of the Bankruptcy Code.

"**Ancillary Agreements**" means the Confidentiality Agreement, any bill of sale, assignment or assumption agreement or other related agreements by and between Seller and Buyer effecting or evidencing the transactions contemplated under this Agreement.

"**Assumed Liabilities**" has the meaning set forth in Section 1.3.

"**Bankruptcy Case**" has the meaning set forth in the Recital.

"**Bankruptcy Code**" has the meaning set forth in the Recital.

"**Bankruptcy Court**" has the meaning set forth in the Recital.

"**Bid Deadline**" shall have the meaning given to such term in the Sale Motion seeking the Bankruptcy Court's issuance of the Sale Procedures Order.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a federal legal holiday.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer's Proration Amount**" has the meaning set forth in Section 2.3.

"**Buyer Expenses**" has the meaning set forth in Section 7.3(d).

"**Chapter 11 Trustee**" has the meaning set forth in the Recitals.

"**Closing**" has the meaning set forth in Section 3.1.

"**Closing Date**" has the meaning set forth in Section 3.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means the confidentiality agreement Buyer executed in conjunction with its review of Seller's records.

"**Confidential Information**" means information that is not generally known or available to the public and that is used, developed or obtained by the Seller in connection with the business, and all proprietary or confidential business information of the Seller or otherwise relating to the business of the Seller, whether in oral, written, graphic, machine-readable, code or tangible or intangible form, whether or not registered, and including financial information, business reports and other confidential and proprietary information, data and documents, regardless of whether any such information, data or documents qualify as "trade secrets" under applicable federal or state law.

"**Contract**" means any contract, agreement, lease or sublease, license or sublicense, instrument, indenture, commitment or undertaking, whether in written form or otherwise.

"**Contract Designation Date**" has the meaning set forth in Section 1.6(a).

"**Cure Costs**" has the meaning set forth in Section 1.3(c).

"**Deposit**" has the meaning set forth in the Recitals.

"**Designated Contracts**" has the meaning set forth in Section 1.1(h).

"**Employee Records**" has the meaning set forth in Section 1.1(m).

"**Employee Benefit Plans**" means (i) all employee benefit plans as defined in section 3(3) of ERISA; (ii) all compensation, pay, severance pay, salary continuation, bonus, incentive, stock option, retirement, pension, profit sharing or deferred compensation plans, Contracts, programs, funds or arrangements of any kind; and (iii) all other employee benefit plans, programs, funds or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated, and whether or not subject to ERISA) and any trust, escrow or similar agreement related thereto, whether or not funded.

"**Employee Claims**" has the meaning set forth in Section 5.3(c).

"**Encumbrance**" means any lien, license to a third party, option, pledge, security interest, mortgage, right of way, easement, encroachment, right of first offer or first refusal, buy/sell agreement and any other material restriction or covenant with respect to, or material condition governing the use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other material attribute of ownership.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Excluded Assets**" has the meaning set forth in Section 1.2.

"**Excluded Contracts**" has the meaning set forth in Section 1.2(i).

"**Excluded Liabilities**" has the meaning set forth in Section 1.4.

"**Execution Date**" has the meaning set forth in the Preamble.

"**Franchise Agreements**" is defined in <u>Section 1.1(c)</u>.

"**Franchisor**" means Perkins & Marie Callender's LLC, a Delaware corporation, d/b/a Perkins Restaurant & Bakery, or its successors-in-interest, whether by merger, acquisition of equity or acquisition of all or substantially all of its assets.

"**Government**" means any agency, division, subdivision or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state or territory thereof.

"**Governmental Authority**" means any United States federal, foreign, state or local government, or political subdivision thereof, or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body, and includes any contractor, acting on behalf of a Governmental Authority.

"**Inventory**" means all of Seller's goods, raw materials, consumable food and beverages and all of Seller's tangible property used in the preparation of, serving, and cleaning-up from meals, including, without limitation, napkins, silverware, plates and dining ware, cups, mugs, cooking and cleaning utensils, and other related items. "**Leased Real Property**" means the real property leased by Seller pursuant to the Real Property Leases.

"**Leasehold Improvements**" means those fixtures, structures and other improvements located on any Leased Real Property used in the operation of Seller's business.

"**Legal Requirement**" means any federal, state or local law, statute, ordinance; common law ruling or regulation, or any Government order, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force or effect of law, or the regulations or requirements promulgated pursuant to any of such statutes.

"**Notification**" has the meaning set forth in <u>Section 1.6(b)</u>.

"**Owned Real Property**" has the meaning set forth in <u>Section 1.1(a)</u>.

"**Perkins**" means any Person operating a Perkins restaurant, whether Franchisor or any franchisee thereof.

"**Permits**" has the meaning set forth in <u>Section 1.1(j)</u>.

"**Permitted Encumbrances**" means Encumbrances for ad valorem personal property Taxes not yet due and payable and Encumbrances which secure only the Assumed Liabilities.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"**Petition Date**" has the meaning set forth in the Recitals.

**"Prepaid Expenses"** has the meaning set forth in <u>Section 1.1(e)</u>.

**"Property Taxes"** has the meaning set forth in <u>Section 1.3(d)</u>.

**"Prorated Amounts"** has the meaning set forth in <u>Section 2.3</u>.

**"Proration"** has the meaning set forth in <u>Section 2.3</u>.

**"Purchase Price"** has the meaning set forth in <u>Section 2.1</u>.

**"Real Property Leases"** has the meaning set forth in <u>Section 1.1(b)</u>.

**"Rebates"** has the meaning set forth in <u>Section 1.2(c)</u>.

**"Related Person"** means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

**"Sale Motions"** has the meaning set forth in <u>Section 5.4(b)</u>.

**"Sale Order"** has the meaning set forth in <u>Section 5.4(b)(ii)</u>.

**"Sale Procedures Order"** has the meaning set forth in <u>Section 5.4(b)(i)</u>.

**"Seller"** has the meaning set forth in the Preamble.

**"Seller's Proration Amount"** has the meaning set forth in <u>Section 2.3</u>.

**"Specified Date"** has the meaning set forth in <u>Section 7.1</u>.

**"Specified Notice"** has the meaning set forth in <u>Section 7.1</u>.

**"Spirit"** means, collectively, Spirit Master Funding III, LLC, Spirit Master Funding IV, LLC and Spirit Finance Acquisitions, LLC.

**"Tax Return"** means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

**"Taxes"** means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or

add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

**"Total Consideration"** has the meaning set forth in <u>Section 2.1</u>.

**"Transaction Taxes"** has the meaning set forth in <u>Section 2.4</u>.

**"Transactions"** means, collectively, the transactions contemplated by this Agreement.

**"Trustee"** means M. Collette Gibbons, not individually, but in her capacity as the Bankruptcy Court appointed Chapter 11 Trustee of Seller.

**"Undisclosed Contract"** has the meaning set forth in <u>Section 1.6(b)</u>.

**"Undisclosed Contract Assignment Order"** has the meaning set forth in <u>Section 1.6(b)</u>.

**"Utility Deposits"** has the meaning set forth in <u>Section 1.2(j)</u>.

**"WARN Act"** means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**SFR II Holdings, LLC**

By:_____
Name:____Kevin Attkisson_____
Title:_____Manager_____

**SELLER:**

**Unique Ventures Group, LLC**

By:_____
Name: M. Colette Gibbons, not individually, but in her capacity as the Bankruptcy Court appointed Chapter 11 Trustee of Unique Ventures Group, LLC

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**SFR II Holdings, LLC**

By:_____

Name:_____

Title:_____


**SELLER:**

**Unique Ventures Group, LLC**

By: *M Colette Gibbons, Chapter 11 Trustee*

Name: M. Colette Gibbons, not individually, but in her capacity as the Bankruptcy Court appointed Chapter 11 Trustee of Unique Ventures Group, LLC

## **Exhibit 5.4(b)(i)**

**Sale Procedures Order**

(See attached)

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 17-20526(TPA) |
| | : | |
| UNIQUE VENTURES GROUP, LLC, | : | |
| | : | |
|   Debtor. | : | |
| | : | CHAPTER 11 |
| _____ | : | |
| M. COLETTE GIBBONS, as Chapter 11 | : | |
| Trustee, | : | |
| | : | |
|   Movant, | : | RELATED TO DOCKET NO. |
| | : | |
| v. | : | |
| | : | |
| 3D ACQUISITIONS, LP, ACCESS | : | |
| POINT, INC., BAINBRIDGE LIMITED | : | HEARING DATE & TIME: |
| PARTNERS, ELMHURST PROPERTIES, | : | TBD |
| INC., GAR FIELD CLUB LP, GERALD | : | |
| FRY COMPANY, PERKINS & MARIE | : | |
| CALLENDER'S LLC, PERKINS | : | RESPONSE DATE: |
| HOLDINGS, LLC, REINHART | : | TBD |
| FOODSERVICE, LLC, PENNSYLVANIA | : | |
| DEPARTMENT OF REVENUE, ALLY | : | |
| BANK, US FOODS, INC., WARREN | : | |
| COUNTY TAX CLAIM BUREAU, | : | |
| BUTLER COUNTY TAX CLAIM | : | |
| BUREAU, ERIE WATER WORKS, | : | |
| MCKEAN COUNTY TAX CLAIM | : | |
| BUREAU, SPIRIT MASTER FUNDING | : | |
| IV, LLC, SPIRIT FINANCE | : | |
| ACQUISITIONS, LLC, SPIRIT MASTER | : | |
| FUNDING V, LLC, and SPIRIT | : | |
| MASTER FUNDING III, LLC, | : | |
| | : | |
|   Respondents. | : | JUDGE THOMAS AGRESTI |
| _____ | : | |

**ORDER: (I) APPROVING BID PROCEDURES FOR SALE OF SUBSTANTIALLY
ALL OF THE DEBTOR'S ASSETS; (II) AUTHORIZING AND SCHEDULING
AN AUCTION; (III) SCHEDULING HEARING FOR APPROVAL OF THE SALE
OF ASSETS FREE AND CLEAR OF LIENS AND THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES TO THE SUCCESSFUL BIDDER; (IV) APPROVING CERTAIN DEADLINES
AND THE FORM, MANNER, AND SUFFICIENCY OF NOTICE; AND
<u>(V) GRANTING OTHER RELATED RELIEF</u>**

This matter coming before the Court on the Motion of Chapter 11 Trustee for an Order: (i) Approving Bid Procedures for Sale of Substantially All of the Debtor's Assets; (ii) Authorizing and Scheduling an Auction; (iii) Scheduling Hearing for Approval of the Sale of Assets Free and Clear of Liens and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to the Successful Bidder; (iv) Approving Certain Deadlines and the Form, Manner, and Sufficiency of Notice; and (v) Granting Other Related Relief, Docket No. __ (the "Procedures Motion"), filed by M. Colette Gibbons, Chapter 11 Trustee (the "Trustee") of Unique Ventures Group, LLC (the "Debtor");

And it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(a); the Court having considered the Procedures Motion,[1] and it appearing that the relief requested in the Procedures Motion is in the best interests of the Debtor's bankruptcy estate, its creditors, and other parties in interest; and objections, if any, having been withdrawn, resolved, or overruled by the Court, and after due deliberation and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS AND CONCLUDES THAT:**

A.     Notice of the Procedures Motion was adequate and sufficient under the circumstances of the Debtor's chapter 11 case, and such notice complied with all applicable requirements of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules of the United States Bankruptcy Court for the Western District of Pennsylvania (the "Local Rules").

B.     The bid procedures attached hereto as <u>Schedule A</u> (the "Bid Procedures") are reasonable and appropriate under the circumstances of the Debtor's chapter 11 case.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Procedures Motion.

C.      The Notice of Bid Procedures, Auction Date, and Sale Hearing, substantially in the form attached hereto as <u>Schedule B</u> (the "Sale and Bid Procedures Notice"), is calculated to provide adequate notice concerning the proposed sale of the Assets, and are intended to provide due and adequate notice of the relief sought in the Sale Motion.

D.      The entry of this Order is in the best interests of the Debtor, its estate, its creditors, and other parties in interest.

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, THE COURT HEREBY ORDERS THAT**:

1.      The Procedures Motion shall be, and hereby is, GRANTED.

2.      The Bid Procedures are approved in their entirety and are incorporated into this Order as though fully set forth herein and shall apply to the Auction and sale of the Assets.

3.      The Trustee is authorized to take any and all actions necessary or appropriate to implement the Bid Procedures.

4.      The Sale Hearing shall be held on **December __, 2017, at 10:00 a.m. (prevailing Eastern Time)**, at the United States Bankruptcy Court for the Western District of Pennsylvania, U.S. Bankruptcy Court, U.S. Courthouse, 17 South Park Row, Erie, PA 16501.

5.      If the Trustee receives more than one Qualified Bid (as defined in the Bid Procedures), an auction (the "Auction") shall be held as part of the Sale Hearing.

6.      Any objections to any of the relief to be requested at the Sale Hearing must be in writing, state the basis of such objections with specificity, and shall be filed with the Court on or before **December __, 2017, at 4:00 p.m. (prevailing Eastern Time)**, and such objections shall be served in accordance with the Sale and Bid Procedures Notice.

7.      The proposed sale of the Assets and the Auction shall be conducted by the Court in accordance with the provisions of this Order and the Bid Procedures.

8.      The Sale and Bid Procedures Notice provides proper notice to all parties in interest and is hereby approved.

9.      Within three business days following entry of this Order, the Trustee shall serve by first class mail the Sale and Bid Procedures Notice on the following parties: (a) the United States Trustee for the Western District of Pennsylvania; (b) counsel to Spirit Finance Acquisitions; (c) counsel to the Official Committee of Unsecured Creditors; (d) all parties known to be asserting a lien on any of the Assets; (e) all known counterparties to contracts and leases that may be assumed and assigned; (f) all entities that were provided with the sale teaser or otherwise known to have expressed an interest in bidding on the Assets; (g) the state and local taxing authorities where the Debtor operates; (h) the United States; (i) the District Director of Internal Revenue; (j) Perkins and Marie Callender's LLC.; (k)  all other parties that filed a notice of appearance and demand for service of papers in the Debtor's bankruptcy case under Bankruptcy Rule 9010(b) as of the date of entry of the Bid Procedures Order; and (l) all known creditors of the Debtor, as set forth in the creditors' matrix and Schedules of Assets and Liabilities as filed with Court.

10.     The Trustee is directed, no more than thirty nor less than fourteen calendar days prior to the Sale Hearing, to publish the Sale and Bid Procedure Notice in the Erie Times-News, the Erie County Legal Journal, and the Nation's Restaurant News.  Such publication notice shall constitute an additional component of the Sale and Bid Procedure Notice.

11.     Within seven business days following entry of this Order, the Trustee shall upload the information required by Local Rule 6004-1 to the Electronic Access to Sales Information system on the Court's website.

12.     Compliance with the foregoing notice provisions shall constitute sufficient notice of the Trustee's proposed sale of the Assets free and clear of all liens, claims, interests, and

encumbrances, and except as set forth in this Order, no other or further notice of the sale shall be required to be provided by the Trustee.

13.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), and 7062 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Order.

14.     In the event there is any inconsistency between the Procedures Motion, Bid Procedures, or this Order, this Order shall govern.

15.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.   All matters arising from or related to the implementation of this Order may be brought before the Court as a contested matter, without the necessity of commencing an adversary proceeding.

IT IS SO ORDERED, this _____ day of _____, 2017.

_____
THOMAS P. AGRESTI, JUDGE
UNITED STATES BANKRUPTCY COURT

## **Exhibit 5.4(b)(ii)**

**Sale Order**

(see attached)

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 17-20526(TPA) |
| | : | |
| UNIQUE VENTURES GROUP, LLC, | : | |
| | : | |
| Debtor. | : | |
| | : | CHAPTER 11 |
| _____ | : | |
| M. COLETTE GIBBONS, as Chapter 11 Trustee, | : | |
| | : | |
| Movant, | : | RELATED TO DOCKET NO. |
| | : | |
| v. | : | |
| | : | |
| 3D ACQUISITIONS, LP, ACCESS POINT, INC., BAINBRIDGE LIMITED PARTNERS, ELMHURST PROPERTIES, INC., GAR FIELD CLUB LP, GERALD FRY COMPANY, PERKINS & MARIE CALLENDER'S LLC, PERKINS HOLDINGS, LLC, REINHART FOODSERVICE, LLC, PENNSYLVANIA DEPARTMENT OF REVENUE, ALLY BANK, US FOODS, INC., WARREN COUNTY TAX CLAIM BUREAU, BUTLER COUNTY TAX CLAIM BUREAU, ERIE WATER WORKS, MCKEAN COUNTY TAX CLAIM BUREAU, SPIRIT MASTER FUNDING IV, LLC, SPIRIT FINANCE ACQUISITIONS, LLC, SPIRIT MASTER FUNDING V, LLC, and SPIRIT MASTER FUNDING III, LLC, | : : : : : : : : : : : : : : : : : : : | HEARING DATE & TIME: TBD RESPONSE DATE: TBD |
| | : | |
| Respondents. | : | |
| _____ | : | JUDGE THOMAS AGRESTI |

**ORDER APPROVING MOTION OF CHAPTER 11 TRUSTEE FOR AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

After a hearing commenced on December __, 2017 (the "Sale Hearing"): (a) upon due notice to all persons and parties entitled thereto; (b) upon consideration of the Motion of Chapter 11 Trustee for an Order: (A) Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (b) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief, Docket No. __ (the "Sale Motion"); (c) pursuant to sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); (d) consistent with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (e) based upon proceedings held during the Sale Hearing; (f) based upon pleadings and proceedings of record at the Sale Hearing; and (g) upon determination of this Court, for good and sufficient cause shown, that consummation of the Asset Purchase Agreement dated as of _____, 2017 (the "APA"), an executed copy of which is attached as Exhibit A hereto, by and between _____ (the "Purchaser") and the Debtor, and the sale of substantially all of the debtor's assets (collectively, the "Acquired Assets," as defined in the APA) and the assumption and assignment of the certain executory contracts and unexpired leases (collectively, the "Assigned Contracts") is in the best interests of Unique Ventures Group, LLC (the "Debtor"), its bankruptcy estate, creditors and other parties in interest, this Court makes the following findings of fact:

A.      On October 10, 2017, M. Colette Gibbons, Chapter 11 Trustee (the "Trustee") of the Debtor filed the Sale Motion, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014, seeking authorization and approval to consummate the sale of substantially all of the of Debtor's assets and assume and assign the Assigned Contracts.

B.    The Trustee has complied with all applicable procedures for providing notice of the sale of the Acquired Assets and the assignment and assumption of the Assigned Contracts. Proper, timely, adequate and sufficient notice of the Sale Motion and Sale Hearing and a reasonable opportunity to object and be heard with respect to the Sale Motion and the relief requested therein was provided and such notice was properly served on all required persons and entities, including, but not limited to, all creditors, all parties with liens against or security interests in any of the Acquired Assets, non-debtor parties to the Assigned Contracts, all local, state and federal taxing authorities, all parties requesting notice in accordance with the Bankruptcy Rules, and all persons claiming any interest in or related to the Acquired Assets.

C.    Proper, timely and adequate and sufficient notice of the Sale Motion, the auction, and the Sale Hearing been provided in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rule 6004-1 and such other applicable sections of the Bankruptcy Code, Bankruptcy Rules and Local Rules. Such notice was good and sufficient, and appropriate under the particular circumstances, and no other or further notice of the Sale Motion, Auction and the Sale Hearing is or shall be required. In compliance with Local Rule of Bankruptcy Procedure 6004-1, the Trustee advertised the Sale Motion, Auction and Sale Hearing in the Erie County Legal Journal on _____, 2017, in the Erie-Times News on ____, 2017, in the Nation's Restaurant News on ___, 2017, and on the Court's Electronic Access to Sales Information (EASI) website beginning on ____, 2017.

D.    The notice adequately and accurately discloses the full terms of the proposed sale and the justification for the proposed sale.

E.    The sale of the Acquired Assets pursuant to the terms and conditions set forth in the APA represents the valid and reasonable exercise of the Trustee's business judgment. The

Trustee has demonstrated both (i) good, sufficient and sound business purpose and justification pursuant to sections 105 and 363 of the Bankruptcy Code, for the sale of the Acquired Assets, and (ii) compelling circumstances for the sale pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization.

F.    Assumption and assignment of the Assigned Contracts is proper under section 365 of the Bankruptcy Code and represents the valid and reasonable exercise of the Trustee's business judgment and is in the best interests of the Debtor, its estate, its creditors and all parties in interest.   The Assigned Contracts are an integral part of the assets being purchased by Purchaser and, accordingly, the assumption and assignment of the Assigned Contracts is reasonable and enhances the value of the Debtor's estate.

G.    The terms and conditions of the APA are non-collusive, fair and reasonable. The APA:

(i)    was negotiated, proposed and entered into without collusion, in good faith, from arm's length bargaining positions; and

(ii)    constitutes the highest or best offer for the Acquired Assets.

Neither the Trustee nor the Purchaser has engaged in any conduct that would cause or permit the APA to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

H.    The consideration to be paid by the Purchaser for the Acquired Assets under the APA (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a higher and better recovery for the Debtor's creditors and other parties in interest than would be provided by any other practical available alternative, and (iv) constitutes reasonably

equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

J.      As to all parties identified in the caption hereof (collectively, the "Respondents"), the Trustee may and shall sell the Acquired Assets free and clear of any and all liens, encumbrances, claims, demands, rights, other interests, debts, or commitments, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, liquidated or unliquidated, senior or subordinated, known or unknown, including, without limitation, any claims predicated upon any theory of successor liability or any similar theory excluding any Assumed Liabilities (defined in the APA) (collectively, the "Interests"), regardless of how or when any such Interests may have arisen or arise, because:

(i)      applicable non-bankruptcy law permits such a sale;

(ii)     bankruptcy law permits such a sale;

(iii)    each applicable creditor consents to the sale as proposed in the Sale Motion;

(iv)     if such Interest is or are a lien, the aggregate value to be received in consideration of the sale of the Acquired Assets exceeds the value of any liens upon and security interests in the Acquired Assets;

(v)      applicable creditors could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Interests; and/or

(vi)     this Court, pursuant to its equitable powers and jurisdiction, has the power and authority to authorize and effectuate the sale of the Acquired Assets to the Purchaser free and clear of all Interests.

K.     The Purchaser has available (or will have available on the Closing) (as defined in the APA) all necessary cash and other resources required to consummate the APA in accordance with its terms and has provided adequate assurance of its ability to perform its obligations under each of the Assigned Contracts within the meaning of sections 365(b)(1) and 365(f) of the Bankruptcy Code.

L.     The Trustee and the Purchaser have represented that, as of the date of the Sale Hearing, neither is aware of any material breaches of any provisions of the APA.

M.     The APA is in the best interest of the Debtor, its creditors, its bankruptcy estate, and all other parties in interest.

N.     A reasonable opportunity to bid, to object or to be heard regarding the relief requested in the Sale Motion has been offered to all interested parties.

O.     The sale is in good faith, and the Purchaser is a good faith purchaser within the meaning of 363(m) of the Bankruptcy Code and in accordance with In re Abbotts Dairies of Pa., Inc., 788 F.2d 193 (3d Cir. 1986). The Purchaser and the Trustee will be acting in good faith within the meaning of section 363(m) in consummating the sale and the Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

NOW, THEREFORE, based upon the findings of fact as set forth above and the pleadings and proceedings of record at the Sale Hearing, this Court renders conclusions of law as follows:

1.     This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. § 1334.

2.     Venue of this bankruptcy case in this Court is proper pursuant to 28 U.S.C. § 1409.

3.      The Sale Hearing constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

4.      The statutory predicates for the requested relief are, inter alia, sections 105, 363 and 365 of the Bankruptcy Code.

5.      No other or further notice of the Sale Motion, the auction, the Sale Hearing or the entry of this Order is necessary.

6.      The notice of the Sale Motion, the auction and the Sale Hearing was good, sufficient and proper notice under the circumstances and timely served upon all creditors, non-debtor parties to the Assigned Contracts, and other parties in interest upon whom service is required, and the notice satisfies the provisions of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, Local Rule 6004-1, and any other requirements of due process.  No further or other notice of the Sale Motion, the auction or the Sale Hearing and the relief requested therein is or shall be required.

7.      The notice of the Sale Motion, the auction and the Sale Hearing served upon creditors, non-debtor parties to the Assumed Contracts, and other parties in interest adequately discloses the business justification for consummation of the APA and all ancillary agreements with the Debtor (and the assumption and assignment of the Assigned Contracts), which execution and delivery of the APA and ancillary agreements (and which assumption and assignment of the Assigned Contracts) is required by the Purchaser as a condition precedent to closing, and the consequences of such consummation for creditors and other parties in interest and for the bankruptcy estate.

8.      The Trustee has demonstrated good, sufficient and sound business reasons for the sale of the Debtor's assets pursuant to the APA and compelling reasons for the sale pursuant to

section 363(b) of the Bankruptcy Code prior to, in contemplation of, and outside of, a plan of reorganization, and the consummation of the APA is in the best interests of the Debtor's creditors, the bankruptcy estate and other parties in interest.  Subject to the entry of this Order, the Trustee has full power and authority to execute the APA and all other documents contemplated thereby, and has all of the power and authority necessary to consummate the transactions contemplated by the APA.  The APA is a valid and binding contract which, upon entry of this Order, shall be enforceable according to its terms.

9.    Assumption and assignment of the Assigned Contracts is proper under section 365 of the Bankruptcy Code, represents the valid and reasonable exercise of the Debtor's business judgment and is in the best interests of the Debtor's creditors, the bankruptcy estate and other parties in interest.

10.    Without a sale free and clear of all Interests, the sale of the Acquired Assets could not be consummated, or could be consummated only upon terms substantially less favorable to the Debtor's estate.

11.    Sufficient cause and justification exist under sections 105(a), 363 and 365 of the Bankruptcy Code to approve the Sale Motion.

12.    The sale is in good faith and the Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and in accordance with In re Abbotts Dairies of Pa., Inc., 788 F.2d 193 (3d Cir. 1986). The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

13.    In the event the parties to the APA consummate the transactions contemplated hereby while an appeal of this Order is pending, the Purchaser shall be entitled to rely upon the protections of section 363(m) of the Bankruptcy Code (without limiting in any way the

availability of general "mootness" arguments), absent any stay pending appeal granted before the Closing (as defined in the APA) by a court of competent jurisdiction.

14.    Accordingly, as to all Respondents, the Acquired Assets may and shall be sold free and clear of all Interests, regardless of how or when any such Interests may have arisen or arise, because:

    a.   Applicable non-bankruptcy law permits such a sale;

    b.   Bankruptcy law permits such a sale;

    c.   Each applicable creditor consents to the sale as proposed in the Sale Motion;

    d.   If such Interests is or are a lien, the aggregate value to be received in consideration of the sale of the Acquired Assets exceeds the value of any liens upon and security interests in the Acquired Assets;

    e.   Applicable creditors could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Interests;

    f.   this Court, pursuant to its equitable powers and jurisdiction, has the power and authority to authorize and effectuate the sale of the Acquired Assets to the Purchaser free and clear of all Interests, and/or

    g.   because such Interests shall attach to the proceeds of the sale of the Acquired Assets to the same extent, with the same validity, in the same order of priority, and with the same degree of perfection (if applicable) as existed on the Petition Date.

15.    The amounts necessary to pay the Cure Amounts set forth in the Order granting the *Omnibus Motion to Establish Cure Amounts for Executory Contracts and Unexpired Leases*

*Pursuant to 11 U.S.C. § 365* (the "Cure Amount Order"), Docket No. ___, for the Assigned Contracts as set forth on Schedule 1.1(g) of the APA will compensate or provide adequate assurance as provided for in sections 365(b)(1) and 365(f). The Purchaser has provided adequate assurance of future performance as required by sections 365(b)(1) and 365(f) of the Bankruptcy Code.

16.     All the transactions contemplated by the APA are properly authorized under sections 105, 363 and 365 of the Bankruptcy Code.

17.     There is no law which prohibits or restricts assignment, conveyance or transfer of any of the Acquired Assets to the Purchaser.

18.     Cause exists to waive the 14-day stay of this Sale Order pursuant to Bankruptcy Rules 6004(h) and 6007(d).

NOW, THEREFORE, based upon the findings of fact and conclusions of law set forth above and the pleadings and proceedings of record at the Sale Hearing,

1.     The Sale Motion is granted in its entirety. The APA (including all ancillary agreements to which the Debtor is a party and which have been previously identified to the Court) is hereby approved in all respects and the sale of the Acquired Assets is hereby authorized under, *inter alia*, sections 105(a), 363(b) and 365 of the Bankruptcy Code. To the extent any objections to the Sale Motion have not been withdrawn, waived or resolved, such objections are hereby denied and overruled.

2.     The findings of fact and conclusions of law set forth above shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact

later shall be determined to be a conclusion of law, it shall be so deemed; and to the extent any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

3.      The Debtor is hereby authorized and directed to execute, deliver and perform the APA and all agreements and documents (each in form and substance acceptable to the Purchaser and its counsel and executed by the Trustee) contemplated thereby, including, without limitation, (i) delivery of a customary bill of sale for the Acquired Assets; (ii) assignment of the Assigned Contracts on Schedule 1.1(g) to the APA; and (iii) such other documents and other instruments of transfer and conveyance, and to take any and all actions as necessary or appropriate to the performance of the obligations contemplated by the APA, as may reasonably be requested by the Purchaser. The Debtor is hereby further authorized and directed to sell all of its right, title and interest in and to the Acquired Assets to the Purchaser, free and clear of any and all Interests, in accordance with the terms of the APA. The APA is, and shall be, binding upon and enforceable against the Debtor and its estate, according to its terms.

4.      Pursuant to sections 105(a), 363(f) and 365(b) of the Bankruptcy Code and this Court's equitable powers and authority, as to all Respondents, (i) the Trustee shall convey and deliver to the Purchaser good, marketable and transferable title to each of the Acquired Assets in which it has an interest at the Closing (as defined in the APA) under the APA, and the Debtor's conveyance and delivery of title to the Acquired Assets, as to all Respondents, hereby is and shall be free and clear of all Interests, including, without limitation, all security interests, if any, in and all liens upon the Acquired Assets, (ii) the transfer of the Acquired Assets shall vest Purchaser with all right, title and interest in and to the Acquired Assets, and (iii) each of the Assigned Contracts shall be deemed assumed by the Debtor and assigned to Purchaser as of the Closing Date, as provided in and contemplated and required by the APA with any such

modifications as are required thereunder or as mutually agreed by the Purchaser and the counterparty to any Assigned Contract.

5.      Except as expressly permitted or otherwise specifically provided by the APA or this Order, all persons and entities, including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding claims or interests of any kind or nature whatsoever, including the Interests, in or against the Debtor or any of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, fixed, liquidated, unliquidated, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtor, the Acquired Assets, or the transfer of the Acquired Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting any claims or interests against the Purchaser, its successors or assigns, its property, or the Acquired Assets.

6.      To the greatest extent allowed by applicable law, except as expressly provided in the APA, the Purchaser is not assuming nor shall it, in any way whatsoever, be or be deemed to be liable or responsible, as successor or otherwise, for any liabilities of the Debtor (other than Assumed Liabilities), or any liabilities in any way whatsoever relating to or arising from the Debtor's assets, business, or operations, or by virtue of the conveyance of the Acquired Assets to Purchaser (other than Assumed Liabilities).  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APA, the transfer of the Acquired Assets to the Purchaser and assumption and assignment to the Purchaser of the Assigned Contracts and the Assumed Liabilities shall be free and clear of all Liens and Interests, and not cause Purchaser to be liable for any claims against the Debtor or any of its predecessors or affiliates, except as expressly set forth in the APA as an Assumed Liability, and the Purchaser

shall have no successor or vicarious liabilities of any kind or character, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or, in any way, relating to the operation or transfer of the Debtor's business or assets prior to the Closing Date.  All liabilities and obligations of the Debtor other than those expressly assumed under the APA, including without limitation liability under ERISA (including COBRA liability) or any potential or contingent liability under any pending or threatened litigation against the Debtor, shall be retained by and remain obligations and liabilities of the Debtor in accordance with the terms and conditions of the APA.

7.    The Trustee is authorized to execute and deliver such documents, take or perform such acts, and do such other things as may be necessary to effect and carry out the provisions of the APA, all of the transactions related thereto and this Order.

8.    Neither conversion of this case to a case under Chapter 7 of the Bankruptcy Code nor dismissal of this case shall have any effect upon the rights of the Purchaser under or in connection with the APA or this Order, and the Purchaser shall be entitled to all of the rights and benefits afforded to it under (i) the APA, (ii) the instruments and documents executed or to be executed in connection with or pursuant to the APA, and (iii) this Order, notwithstanding any such conversion or dismissal. The APA and this Order shall be binding upon and enforceable against any trustee appointed in this case or in any case to which this case may be converted. No plan of reorganization or liquidation filed or confirmed in this case shall alter in any way the terms of the APA or this Order, including (without limitation) any of the rights of the Purchaser under the APA or this Order. The provisions of the APA and of this Order shall remain in full

force and effect notwithstanding the confirmation of any plan. In the event of any conflict between the terms of the APA and the terms of any plan of reorganization or liquidation confirmed in this case, the terms of the APA shall govern and control. Each provision of this Order is a material inducement to the Purchaser to consummate the transactions contemplated by the APA and, therefore, the provisions of this Order are and shall be non-severable.

9.    The assumption by the Debtor and assignment to the Purchaser of the Assigned Contracts is hereby authorized and approved.  The non-debtor parties to the Assigned Contracts are bound to the Cure Amounts set forth in the Cure Amount Order.  The Purchaser shall be responsible for curing all pre-petition monetary and non-monetary defaults with respect to each of the Assigned Contracts.

10.    All defaults or other obligations of the Debtor under the Assigned Contracts arising or accruing prior to the Closing Date shall be deemed cured, subject to the satisfaction of the provisions of the immediately preceding paragraph (relating to payment of the applicable cure amounts), and the Purchaser shall have no liability or obligation arising or accruing under the Assigned Contracts prior to the Closing Date, except as otherwise expressly provided in the APA or this Order.  As of the Closing, subject to the provisions of this Order, the Purchaser shall succeed to the entirety of the Debtor's rights and obligations in the Assigned Contracts.  The Assigned Contracts, consistent with the provisions contained herein, shall be assigned to, and remain in full force and effect for the benefit of the Purchaser, in accordance with their respective or mutually agreed modified terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further claims or liability

of any kind whatsoever with respect to the Assigned Contracts after such assignment to the Purchaser.

11.     The APA has been undertaken by Purchaser and Debtor in good faith, and Purchaser is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code because:  (a) Debtor and Purchaser engaged in good faith, arm's length negotiations in connection with the APA; and (b) in the absence of a stay pending appeal, Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the sale as contemplated by the APA at any time after the entry of this Sale Order, and such closing in the face of an appeal will not deprive Purchaser of its status as a good-faith purchaser.  The reversal or modification on appeal of the authorizations provided herein to consummate the sale shall not affect the validity of the sale to Purchaser, including the assumption and assignment of the Assigned Contracts.

12.     This Court retains sole and exclusive jurisdiction to resolve any and all matters or disputes arising under or relating to the APA (including, without limitation all post-closing obligations thereunder), the sale of the Acquired Assets, the assumption and assignment of the Assigned Contracts, the administration of the sales proceeds by the Trustee, the implementation, interpretation or enforcement of this Order, and the relief and protection afforded to the Purchaser by this Order.

13.     This Order shall be effective and enforceable immediately upon entry and the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is hereby waived.

IT IS SO ORDERED, this _____ day of _____, 2017.


_____
THOMAS P. AGRESTI, JUDGE
UNITED STATES BANKRUPTCY COURT

## Schedule 1.1(a)

**Owned Real Property**

Elm Road – Elm Road, OH
Building on Ground Lease

R. 358 Hadley Rd. PA - Greenville, PA
Building on Ground Lease

Wilmington Rd., PA - New Castle, PA
Building on Ground Lease

## Schedule 1.1(b)

## Real Property Leases

| Contract Counterparty | Description of Contract or Lease | Contact | Estimated Cure Amount[1] |
|---|---|---|---|
| 3D Acquisitions, LP | Lease of 20013 Route 19, Mars, PA | Vincent A. DiAntonio<br>1520 Gilmore Drive Jefferson Hills, PA 15025<br>Tel: (412) 443-6317<br>Email: vdianton@aol.com<br><br>Dixon R. Rich, Jr., Esquire<br>525 William Penn Place<br>28th Floor<br>Pittsburgh, PA 15219<br>Tel: (412) 931-8995<br>Email: dixon@dixonrich.com | $148,520.83 |
| Bainbridge Limited Partners | Lease of 11299 Baco Road, Meadville, PA | John Bainbridge<br>10245 Nancy Drive<br>Meadville, PA 16335<br>Tel: (814) 336-2174<br>Email: baco@zoominternet.net | $2,131.62 |
| Elmhurst Properties, Inc. | Lease of 3870 Elm Road NE, Warren, OH | Tom Terleski, President<br><br>2170 Millennium Boulevard Suite K<br><br>Cortland, OH 44410<br>Tel:<br>Email: turksail@gmail.com | $1,255.60 |
| Gar Field Club LP | Lease of 3334 Wilmington Road, New Castle, PA | John A. Mueller, Esquire<br>Lippes Mathias Wexler Friedman LLP<br>50 Fountain Plaza, Ste. 1700<br>Buffalo, NY 14202-2216<br>Tel: (716) 362-7614<br>Email: jmueller@lippes.com | $16,503.12 |
| Gerald Fry | Lease of Route 358 | Brian Scott | $2,800.00 |

---

[1] Such Cure Amounts are subject to change based on Bankruptcy Court approval.

| Company | Hadley Road, Greenville, PA | 170 Hadley Road<br><br>Greenville, Pennsylvania 16125<br>Tel: (724) 588-8803<br>Email: flyby.bws@verizon.net | |
|---|---|---|---|
| Spirit Master Funding III, LLC | Master Lease of 7175 Engle Road, Middleburg Heights, OH | Tyler Sorensen<br>2727 N. Harwood St., Ste. 300<br>Dallas, TX 75201<br>Tel: (972) 476-1900<br>Email: tsorenson@spiritrealty.com<br><br>Jared S. Roach, Esquire<br>ReedSmith LLP<br>Reed Smith Centre<br>225 Fifth Avenue<br>Pittsburgh, PA 15222<br>Tel: (412) 288-3131<br>Email: jroach@reedsmith.com | $596,983.754 |
| | Master Lease of 1601 Prospect Road, Ashtabula, OH | | |
| | Master Lease of 4334 Buffalo Road, Erie, PA | | |
| | Master Lease of 1871 Oakland Avenue, Indiana, PA | | |
| | Master Lease of 587 East Main Street, Canfield, OH | | |
| | Master Lease of 115 Ludlow Street, Warren, PA | | |
| | Master Lease of 2714 West Lake Road, Erie, PA | | |
| | Master Lease of | | |

| | | | |
|---|---|---|---|
| | 915 West Main Street, Grove City, PA | | |
| | Master Lease of 78 Perkins Road, Clarion, PA | | |
| | Master Lease of 18276 Conneaut Lake Road, Meadville, PA | | |
| | Master Lease of 207 Plum Street, Edinboro, PA[2] | | |
| | Master Lease of 1953 Niles-Cortland Road, Warren, OH | | |
| | Master Lease of 4403 Peach Street, Erie, PA | | |
| | Master Lease of 31-35 Bolivar Drive, Bradford, PA | | |
| | Master Lease of 2728 West State Road, Olean, NY | | |
| | Master Lease of 310 West Columbus Avenue, Corry, PA | | |
| | Master Lease of 5550 Interstate Boulevard, Austintown, OH | | |

---

[2] This location has been closed due to a fire on the premises.

{6928206:17}

| | Master Lease of 4896 Everhard Road, Canton, OH | | |
|---|---|---|---|
| | Master Lease of 804 Boardman-Poland Road, Youngstown, OH | | |
| Spirit Master Funding IV, LLC | Lease of 658 US Route 250, Ashland, OH | Tyler Sorensen<br>2727 N. Harwood St., Ste. 300<br>Dallas, TX 75201<br>Tel: (972) 476-1900<br>Email: tsorenson@spiritrealty.com<br><br>Jared S. Roach, Esquire<br>ReedSmith LLP<br>Reed Smith Centre<br>225 Fifth Avenue<br>Pittsburgh, PA 15222<br>Tel: (412) 288-3131<br>Email: jroach@reedsmith.com | $20,408.67 |
| Spirit Finance Acquisitions, LLC | Lease of 5180 Tiedeman Road, Brooklyn, OH[3] | Tyler Sorensen<br>2727 N. Harwood St., Ste. 300<br>Dallas, TX 75201<br>Tel: (972) 476-1900<br>Email: tsorenson@spiritrealty.com<br><br>Jared S. Roach, Esquire<br>ReedSmith LLP<br>Reed Smith Centre<br>225 Fifth Avenue<br>Pittsburgh, PA 15222<br>Tel: (412) 288-3131<br>Email: jroach@reedsmith.com | $72,470.02 |
| | Lease of 2945 East State Street, Hermitage, PA | | $25,461.12 |
| | Lease of 219 East Central Avenue, Titusville, PA | | $25,189.86 |

---

[3] This location has been closed due to a fire on the premises.

## <u>Schedule 1.1(c)</u>

### Franchise Agreements

1.     Ashland          -     License Agreement
2.     Ashtabula        -     License Agreement
3.     Brooklyn         -     License Agreement
4.     Bradford         -     License Agreement
5.     Canfield         -     License Agreement
6.     Clarion          -     License Agreement
7.     Boardman         -     License Agreement
8.     Corry            -     License Agreement
9.     Edinboro         -     License Agreement
10.    Elm Road         -     License Agreement
11.    Erie East        -     License Agreement
12.    Erie South       -     License Agreement
13.    Erie West        -     License Agreement
14.    Greenville       -     License Agreement
15.    Grove City       -     License Agreement
16.    Indiana          -     License Agreement
17.    Meadville        -     License Agreement
18.    New Castle       -     License Agreement
19.    Niles            -     License Agreement
20.    Olean            -     License Agreement
21.    Sharon           -     License Agreement
22.    Titusville       -     License Agreement
23.    Austintown       -     License Agreement
24.    Warren           -     License Agreement
25.    Mars             -     License Agreement
26.    Canton           -     License Agreement
27.    Middleburg Heights - License Agreement

| Contract Counterparty | Description of Contract or Lease | Contact | Estimated Cure Amount[4] |
|---|---|---|---|
| Perkins & Marie Callender's, LLC | Various Perkins franchise agreements | Joel M. Walker, Esquire<br>Duane Morris, LLP<br>Suite 5010<br>600 Grant Street<br>Pittsburgh, PA 15219<br>Tel: (412) 497-1042 | $138,631.56 |

---

[4] Such Cure Amounts are subject to change based on Bankruptcy Court approval.

{6928206:17}

| | | Email: jmwalker@duanemorris.com | |
|---|---|---|---|

## **Schedule 1.1(h)**

### **Designated Contracts**

All Real Property Leases and all Franchise Agreements listed in Schedules 1.1(b) and 1.1(c).

Other contracts to be designated in accordance with Section 1.6.

## Schedule 1.1(o)

### Acquired Vehicles

2003 Workhorse Food Truck and grill with trailer

2009 Ford Focus

2009 Chevy Impala

2008 Chevy Impala

2015 Jeep Grand Cherokee

**<u>Schedule 1.2(c)</u>**

**Rebates**

| |
|---|
| NextEra Energy Services Pennsylvania, LLC |
| The Cleveland Electric Illuminating Company |
| The East Ohio Gas Company d/b/a Dominion East Ohio |
| Ohio Edison Company |
| West Penn Power Company |
| Other Gas Providers |
| Other Electric Providers |
| Water |
| Sewer |

Various minor rebates from small food vendors

Certain rebates for I.C.E. Pinnacle toy crane machines at each location, pursuant to that certain 3D Amusements Location Agreement dated July 15, 2015.

## **Schedule 2.5**

### **Allocation**

To be supplemented prior to the Specified Date.

## Schedule 4.1(d)

### No Brokers

None.