UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 17-20526(TPA) |
| | : | |
| UNIQUE VENTURES GROUP, LLC, | : | |
| | : | |
| Debtor. | : | |
| _____ | : | CHAPTER 11 |
| M. COLETTE GIBBONS, as Chapter 11 Trustee, | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | |
| | : | |
| 3D ACQUISITIONS, LP, ACCESS POINT, INC., BAINBRIDGE LIMITED PARTNERS, ELMHURST PROPERTIES, INC., GAR FIELD CLUB LP, GERALD FRY COMPANY, PERKINS & MARIE CALLENDER'S LLC, PERKINS HOLDINGS, LLC, REINHART FOODSERVICE, LLC, PENNSYLVANIA DEPARTMENT OF REVENUE, ALLY BANK, US FOODS, INC., WARREN COUNTY TAX CLAIM BUREAU, BUTLER COUNTY TAX CLAIM BUREAU, ERIE WATER WORKS, MCKEAN COUNTY TAX CLAIM BUREAU, SPIRIT MASTER FUNDING IV, LLC, SPIRIT FINANCE ACQUISITIONS, LLC, SPIRIT MASTER FUNDING V, LLC, and SPIRIT MASTER FUNDING III, LLC, | : | HEARING DATE & TIME: TBD

RESPONSE DATE: TBD |
| | : | |
| Respondents. | : | |
| _____ | : | JUDGE THOMAS AGRESTI |

**MOTION OF CHAPTER 11 TRUSTEE FOR AN ORDER: (I) APPROVING BID PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (II) AUTHORIZING AND SCHEDULING AN AUCTION; (III) SCHEDULING HEARING FOR APPROVAL OF THE SALE OF ASSETS FREE AND CLEAR OF LIENS AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO THE SUCCESSFUL BIDDER; (IV) APPROVING EXPENSE REIMBURSEMENT; (V) APPROVING CERTAIN DEADLINES AND THE FORM, MANNER, AND SUFFICIENCY <u>OF NOTICE; AND (VI) GRANTING OTHER RELATED RELIEF</u>**

{6948259:5}              {6948259:5}

M. Colette Gibbons, the Chapter 11 Trustee (the "Trustee") of Unique Ventures Group LLC (the "Debtor"), by and through her undersigned counsel, hereby moves the Court (this "Motion"), pursuant to sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the Western District of Pennsylvania (the "Local Rules"), for the entry of an order (the "Bid Procedures Order"): (i) approving bid procedures for the sale of substantially all of the Debtor's assets (the "Assets"); (ii) setting a date for and authorizing an auction (the "Auction") to sell substantially all of the Assets; (iii) scheduling a hearing (the "Sale Hearing") for approval of a sale of all or part of the Assets free and clear of liens, claims, encumbrances, and other interests, and the assumption and assignment of certain executory contracts and unexpired leases; (iv) authorizing payment of an expense reimbursement with respect to the Assets; (v) approving certain deadlines and the form, manner, and sufficiency of notice of the foregoing; and (vi) granting other related relief.

In support of the Motion, the Trustee represents as follows:

**Background**

1. On February 13, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On March 23, 2017, the Court appointed the Trustee as Chapter 11 Trustee for the Debtor and its estate pursuant to an Order (Docket No. 158).

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of the Debtor's chapter 11 case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**The Trustee's Marketing Process**

3. As part of the initial marketing process, the Trustee and her professionals worked on: (a) drafting and negotiating confidentiality agreements for prospective purchasers;

(b) preparing detailed information about the Debtor's business, operations and financial condition; (c) identifying and contacting potential purchasers; (d) establishing a data room for due diligence to be conducted by prospective purchasers; (e) evaluating proposals from prospective purchasers; and (f) negotiating a stalking horse offer.

4. In June 2017, the Trustee and her professionals prepared a transaction introduction sale teaser for distribution to potential purchasers, which provided a brief overview of the Debtor and its operations. This teaser was sent to parties that the Trustee believed might have a potential interest in the Assets and the financial wherewithal to consummate the transaction. A form of nondisclosure agreement ("NDA") was provided to any party that responded to the teaser.

5. The Trustee and her professionals then completed a confidential information memorandum (the "Memorandum"), which included a more comprehensive analysis of the Debtor's history, operations, strategy and financial performance. The Trustee's professionals also set up an electronic data room website (the "Data Room"), which contains financial information as well as leases, contracts and other documents pertaining to the Debtor's operations and financial performance. All of the information may be instantly accessed by potential bidders (once such parties execute the NDA) via password through the Data Room.

6. As part of the marketing efforts to date, the Trustee's professionals have sent the sale teaser to over 240 potential investors/buyers. Of those contacted, 8 executed an NDA and were given operational, organizational and financial information on the Debtor, and access to the electronic data room. All parties that executed an NDA received a copy of the Memorandum. The Trustee subsequently narrowed the process for identifying a stalking horse bidder to a few potential bidders and received two expressions of interest from those interested parties. After several weeks of negotiation with those parties, the Trustee determined that it was in the estate's best interest to select a stalking horse bidder.

7.    The Bid Procedures and this Motion contemplate a proposed sale timeframe that will allow a closing to occur prior to December 31, 2017.  In order to maintain that proposed timetable, the Trustee is a requesting that the Court schedule a hearing on this Motion at the end of October, which will still give the Trustee the requisite amount of time to continue to market the Assets and solicit further bids while still maintaining a favorable timeline for closing a sale in 2017.

**The Stalking Horse Offer for the Assets**

8.    In September 2017, the Trustee received an offer (the "Stalking Horse Bid") from SFR II Holdings, LLC, a Delaware limited liability company (the "Stalking Horse Bidder"), to purchase substantially all of the Assets.

9.    After consultation with her advisors and further negotiations, the Trustee determined that the Stalking Horse Bid was the highest and best offer received to date and provided the opportunity to maximize value for the Assets.  Accordingly, the Trustee and the Stalking Horse Bidder entered into an Asset Purchase Agreement, dated October 12, 2017, a copy of which is attached hereto as Exhibit A ("Stalking Horse APA").  The Stalking Horse APA is subject to higher and better offers and conditioned upon approval of the Court.

10.    The sale terms proposed by the Stalking Horse Bidder are set forth with particularity in the Stalking Horse APA.  In general, the Trustee will sell (and the Stalking Horse Bidder will buy) substantially all of the Assets, including certain of the Debtor's owned real property, rights to leased property, furniture, fixtures and equipment, franchise agreements, certain leases and contracts, intellectual property, inventory, goodwill and general intangibles, and other tangible personal property.[1]  Cash, cash equivalents, pre-closing accounts receivable and certain non-operating assets, such as causes of action arising under chapter 5 of the Bankruptcy Code and

---

[1] In the event of a conflict between the summary descriptions of the Stalking Horse APA contained herein and the Stalking Horse APA, the latter shall control.

{6948259:5}    4

other assets not associated with the intellectual property of Perkins and Marie Callender's LLC (the "Licensor"), are all excluded assets that will be left behind for the Debtor's estate.

11. The purchase price for the Assets under the Stalking Horse APA is $2,868,000 (the "Stalking Horse Purchase Price"), plus cure costs for executory contracts or unexpired leases to be assumed and assigned and any specified assumed liabilities. The Stalking Horse APA also provides, among other things, as follows:

(a) The Assets will be sold free and clear of liens, claims, encumbrances, and other interests;

(b) The Court will approve payment to the Stalking Horse Bidder of an expense reimbursement in an amount not to exceed $100,000 (the "Expense Reimbursement") for the Stalking Horse Bidder's reasonable and documented out-of-pocket expenses incurred in connection with the Stalking Horse APA. The Expense Reimbursement will constitute an administrative expense of the Debtor payable upon the closing of any transaction pursuant to an overbid by a party other than the Stalking Horse Bidder, subject to final approval by the Court after the filing of a motion and opportunity for a hearing;

(c) The Stalking Horse APA will be subject to higher and better bids pursuant to the Bid Procedures (as defined below);

(d) Certain executory contracts and unexpired leases will be assumed by the Debtor and assigned to the Stalking Horse Bidder, with the payment of all cure costs being paid by the Stalking Horse Bidder in accordance with the terms of the Stalking Horse APA;

(e) The Stalking Horse Bidder will assume certain specifically identified ordinary course trade obligations of the Debtor; and

(f) Except as expressly stated in the Stalking Horse APA, the Trustee is making no representation or warranties whatsoever, express or implied, with respect to any matter relating to the Assets. The Assets are being sold on an "AS IS, WHERE IS" basis.

**Proposed Bid Procedures**

12. By this Motion, the Trustee requests approval of the bid procedures attached hereto as <u>Exhibit B</u> (the "Bid Procedures"), including a proposed timetable for a sale that will be able to

{6948259:5}  5

close before December 31, 2017. Subject to the Court's calendar[2], the Bid Procedures generally provide:

- Bids may be made for substantially all of the Assets or for some of the locations.

- Bids must be received on or before **December 11, 2017** at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").

- To be a Qualified Bid (as defined in the Bid Procedures), an offer must be: (a) definitive and binding, not subject to due diligence or any conditions other than Court approval; (b) accompanied by evidence of financial wherewithal of the proposed buyer acceptable to the Trustee in her sole discretion; (c) accompanied by a deposit of immediately available funds of 5% of the proposed cash purchase price; and (d) accompanied by an asset purchase agreement marked to show changes from the Stalking Horse APA

- Approval by the Licensor to operate as a franchisee of PERKINS® RESTAURANTS.

- A Qualified Bid must also contemplate a cash purchase price (and corresponding assumption of liabilities and payment of cure costs) of at least the Stalking Horse Purchase Price plus an initial overbid of $125,000. Further bid increments will be $100,000.

- An auction (the "Auction") of all Qualified Bidders (as defined in the Bid Procedures) will be conducted by the Court on or before **December 14, 2017**, and take place at the United States Bankruptcy Court for the Western District of Pennsylvania, U.S. Bankruptcy Court, U.S. Courthouse, 17 South Park Row, Erie, PA 16501.

- The Auction will continue until the Court determines the highest and best offer for the Assets (the "Successful Bid") and the next highest and best Qualified Bid for such assets as the next highest and best offer for such assets (each a "Backup Bid"). The Qualified Bidder(s) (as defined in the Bid Procedures) submitting a Successful Bid shall be the "Successful Bidder" and the Qualified Bidder submitting a Backup Bid shall be the "Backup Bidder."

### **Approval of Bid Procedures**

13.     The Trustee submits that the Bid Procedures are fair and reasonable and should be approved. The Bid Procedures are designed to provide an organized process for the receipt and review of bids from potential purchasers with an ability to close on the sale of the assets and to

---

[2] The proposed dates are used herein only to reference a potential proposed timeline and are subject to approval by the Court.

maximize value to the Debtor's estate. The requirements of a deposit and evidence of financial wherewithal is designed to confirm that auction participants are *bona fide* bidders with the ability and desire to consummate any proposed transaction.

14. The Bid Procedures also contemplate a reasonable timeline for the marketing of assets, identification of potential bidders, submission of qualified bids, timing of an auction, and scheduling of a sale hearing. The proposed schedule contemplates a period of at least four weeks after the entry of the Bid Procedures Order for the submission of bids. The Trustee believes this time period is a sufficient time frame to maximize value for the Assets, considering the other marketing efforts already undertaken by the Trustee and the additional marketing efforts the Trustee will continue after entry of the Bid Procedure Order. The Trustee believes the requested timing strikes the appropriate balance between affording potential bidders a sufficient opportunity to perform due diligence while not unduly prolonging the sale process.

15. A trustee may sell, after notice and a hearing, their assets outside the ordinary course of business. See 11 U.S.C. § 363. Generally, to obtain approval of a proposed sale of assets, a trustee must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case. See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)). To that end, bidding procedures must "facilitate an open and fair public sale designed to maximize value for the estate." In re Nashville Senior Living, No. 08-07254, 2008 WL5062366, at *1 (Bankr. M.D. Tenn. Oct. 22, 2008) (quoting In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998)).

16. The Bid Procedures will help ensure the Trustee receives the highest or otherwise best offer or offers for the Assets and will maximize the value of the Assets for the Debtor's estate. The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business have been approved by bankruptcy courts in this District as a means of ensuring that such sale will generate the highest and best return for a debtor's estate. See e.g., In re Gulf Chemical & Metallurgical Corporation et al., Case No. 16-22192-JAD (Bank. W.D. Pa. July 12, 2016); In re Max & Erma's Rest., Inc., Case No. 09-27807-MBM (Bankr. W.D. Pa. July 22, 2010); In re Buffalo Molded Plastics, Inc. d/b/a Andover Indus., Case No. 04-12782-TPA (Bankr. W.D. Pa. Feb. 25, 2005).[3] The Trustee submits that the adoption of the Bid Procedures will properly subject the Assets to competitive bidding while preserving the Stalking Horse Bid, thereby providing a floor price for the Assets and the best possible market price.

**Approval of Expense Reimbursement**

17. In recognition of the value of having a bidder setting a minimum price for the Assets, the risk of approval of a higher and better bid, and the time and expense incurred by the Stalking Horse Bidder in conducting due diligence and in negotiations with the Trustee, the Stalking Horse APA provides that in the event the Court approves a sale to another party, the Stalking Horse Bidder will be paid the Expense Reimbursement (subject to final approval by the Court after the filing of a motion and opportunity for a hearing).

18. The Stalking Horse Bidder was unwilling to enter into the Stalking Horse APA without the inducement of the Expense Reimbursement on these terms. Without the Stalking Horse Bidder, the Trustee would not have the certainty of a minimum price for the Assets, thus, the Expense Reimbursement helps preserve the value of the Debtor's estate. See Corradino v.

---

[3] Copies of these orders are available upon request to the Trustee's counsel.

{6948259:5}                                                8

Lamb (In re Lamb), No. 96-1-1099-DK, 2002 WL 31508913, at *2 (Bankr. D. Md. Oct. 11, 2002) (stating that a break-up fee should be in the best interest of the estate and necessary); see also Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 536-38 (3d Cir. 1999).

19. Bidding incentives such as expense reimbursements or break-up fees are "carefully scrutinized" in asset sales under section 363(b) of the Bankruptcy Code to ensure that a debtor's estate "is not unduly burdened and that the relative rights of the parties are protected." See In re Hupp Indus. Inc., 140 B.R. 191, 195-96 (Bankr. N.D. Ohio 1992). The Third Circuit has held that the party requesting any form of break-up fee must show that the fee is actually necessary to preserve the value of the debtor's estate. In re O'Brien Envtl. Energy, Inc., 181 F.3d at 535. In that respect, the Third Circuit elaborated that such value might be found to exist if: (i) the guarantee of a break-up fee led to more competitive bidding; (ii) the bid of the bidder served as a "catalyst" to higher bids; and (iii) the promise of a break-up fee enticed a bidder to conduct diligence on the debtor's value and then proceeded to convert that value to a dollar amount on which other bidders could rely. Id. at 537.

20. The proposed Expense Reimbursement is fair and reasonable in relation to the proposed purchase price and the funds and efforts expended by the Stalking Horse Bidder to consummate this transaction. Hupp Indus., 140 B.R. at 194. The Bid Procedures will allow the Trustee to solicit other potential offers while the Stalking Horse Bidder provides a floor for the value of the Assets. The Trustee believes that the proposed Expense Reimbursement will not chill competitive bidding for the Assets. Instead, the Trustee believes that the Stalking Horse Bid will entice other potential bidders to come forward and will play a key role in maximizing the value of the Assets.

21. Finally, the Expense Reimbursement is the result of good faith, arm's length negotiations between the Trustee and the Stalking Horse Bidder. See In re Integrated Resources

Inc., 147 B.R. 650, 658 (S.D.N.Y. 1992) ("A bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations."). Under the circumstances, the Trustee believes that the Expense Reimbursement is a fair, reasonable and necessary cost of the administration of the estate and should be approved.

### Right of First Refusal

22.     Section 12(c) of each of the Debtor's license agreements with the Licensor provides that the Licensor has a right of first refusal to match any bona fide purchase offer (collectively, the "ROFR") within 30 days from receipt of such offer (the "Thirty Day Exercise Period"). In light of this, the Trustee and Licensor have agreed upon what they believe to be a balanced approach to addressing the existence of the ROFR in the context of this sale, while still accommodating and honoring the bargained-for rights of the Licensor.[4] As such, the Bid Procedures contemplate that the Licensor will retain its rights to exercise the ROFR at the Auction on the following modified basis:

- The Licensor waives the Thirty Day Exercise Period.

- The Licensor shall have a one-time right to exercise its ROFR (the "ROFR Exercise") at the Auction by matching the terms and conditions of the final bid at the conclusion of the Auction.

- In the event that the Stalking Horse Bidder is the only Qualified Bidder, the Licensor may exercise its ROFR at the Sale Hearing by matching the terms and conditions of the Stalking Horse Bid except that the cash payable shall be $2,993,000.

- With regard to any Piecemeal Sales (as defined in the Bid Procedures), the Licensor shall have the right to exercise its ROFR with regard to any proposed Piecemeal Sale (the "Piecemeal Exercise(s)") by matching the terms and conditions of the

---

[4] The Trustee notes that bankruptcy courts have the ability to apply a "facts and circumstances" test when adjudicating rights of first refusal. See In re Adelphia Communications Corp., 359 B.R. 65, 86 (Bankr. S.D.N.Y. 2007); Hannaford Bros. Co. v. In re Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.), 316 B.R. 772, 794–795 (Bankr.S.D.N.Y.2004); Northrop Grumman Tech. Servs., Inc. v. The Shaw Group Inc. (In re IT Group, Inc., Co.), 302 B.R. 483, 488 (D.Del. 2003); In re E–Z Serve Convenience Stores, Inc., 289 B.R. 45 (Bankr.M.D.N.C. 2003); In re Chicago Investments, LLC, 470 B.R. 32, 90 (Bankr. D. Mass. 2012) (finding that the presence of a ROFR would chill a potential resolution of an outstanding claim, and the franchisor would not be harmed if it was not enforced).

{6948259:5}                                        10

      final bid(s) (including the purchase price(s)) for a Piecemeal Sale at the conclusion of the Auction.

- The Licensor is deemed to be a Qualified Bidder.

- Because any ROFR Exercise or Piecemeal Exercise must match the terms and conditions of the final bid(s), the Licensor shall not be required to satisfy the requirements of Section IV of the Bid Procedures prior to the Auction, and at no time shall it be required to post a Good Faith Deposit.

### Sale Hearing

23.    The Trustee requests that the Court schedule the Sale Hearing and Auction no later than December 14, 2017. The Trustee proposes that general objections, if any, to the Sale Motion be filed no later than a week prior to the Sale Hearing.

24.    At the Sale Hearing and pursuant to the Sale Motion (filed contemporaneously herewith), the Trustee will seek Court approval of the sale of the assets to the highest and best bidder, free and clear of all liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than any permitted encumbrances) with all such liens, claims, encumbrances, and interests to attach to the proceeds of the sale, except as otherwise provided, with the same validity and in the same order of priority as they attached to the assets prior to the sale.

### Notice of Bid Procedures, Auction and Sale Hearing

25.    The Trustee requests that the Court approve the manner of notice of the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as <u>Exhibit C</u> (the "Sale and Bid Procedures Notice"). In accordance with Local Rule 6004-1(d), the Trustee proposes to serve the Sale and Bid Procedures Notice on the following parties via first-class mail, to the extent such parties do not otherwise receive notice via the Court's CM/ECF System: (a) the United States Trustee for the Western District of Pennsylvania; (b) counsel to Spirit Finance Acquisition; (c) counsel to the Official Committee of Unsecured Creditors; (d) all parties known to be asserting a lien on any of the Debtor's Assets; (e) all known counterparties to contracts and

leases that may be assumed and assigned; (f) all entities that were provided with the sale teaser or otherwise known to have expressed an interest in bidding on the Assets; (g) the state and local taxing authorities where the Debtor operates; (h) the United States; (i) the District Director of Internal Revenue; (j) Perkins and Marie Callender's LLC; and (k) all other parties that filed a notice of appearance and demand for service of papers in the Debtor's bankruptcy case under Bankruptcy Rule 9010(b) as of the date of entry of the Bid Procedures Order.

26. The Trustee also proposes to serve the Sale and Bid Procedures Notice on all known creditors of the Trustee. The Trustee also proposes that, no more than thirty nor less than fourteen calendar days prior to the Sale Hearing, she will publish the Sale and Bid Procedures Notice in the Erie Times-News, the Erie County Legal Journal, and the Nation's Restaurant News. Finally, the Trustee further proposes that she will upload the information required by Local Rule 6004-1 to the Electronic Access to Sales Information system on the Court's website.

27. The Trustee intends to serve the Sale and Bid Procedures Notice within three business days from the date of entry the Bid Procedures Order, by first-class mail, postage prepaid, on the appropriate parties as described above. The Sale and Bid Procedures Notice will provide that any party that has not received a copy of this Motion or the Bid Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to McDonald Hopkins LLC, 600 Superior Avenue, E., Suite 2100, Cleveland, Ohio 44114, Attention: Scott N. Opincar, or by email to [sopincar@mcdonaldhopkins.com](mailto:sopincar@mcdonaldhopkins.com).

28. Assuming that the Court approves the timeline proposed in this Motion, the Trustee submits that such notice is sufficient under the circumstances, and requests that the Court find that no further notice of the relief requested herein is required.

## Notice

29. Notice of this Motion has been served on the following parties or, in lieu thereof, to their counsel, if known: (i) the United States Trustee for the Western District of Pennsylvania;

(ii) the Official Committee of Unsecured Creditors; (iii) counsel to Spirit Finance Acquisition; (iv) Perkins and Marie Callender's LLC; (v) the District Director of Internal Revenue; (vi) all known counterparties to contracts or leases that may be assumed; and (vii) all other parties requesting notice in the Debtor's chapter 11 case.  In light of the nature of the relief requested herein, the Trustee submits that no other or further notice need be given.

WHEREFORE, the Trustee requests that the Court enter an order: (i) approving the Bid Procedures for the sale of substantially all of the Assets, (ii) authorizing and scheduling the Auction; (iii) scheduling a hearing for approval of the sale of the Assets free and clear of liens and the assumption of certain executory contracts and unexpired leases to the Successful Bidder; (iv) approving the allowance of the Expense Reimbursement to the Stalking Horse Bidder; (v) approving certain deadlines and the form, manner, and sufficiency of the Sale and Bid Procedures Notice; and (vi) granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: October 13, 2017

Respectfully submitted,

/s/ Nicholas R. Pagliari
Nicholas R. Pagliari (PA ID No. 87877)
MacDonald, Illig, Jones & Britton LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507
Telephone: (814) 870-7754
Facsimile: (814) 454-4647
Email: npagliari@mijb.com

COUNSEL FOR CHAPTER 11 TRUSTEE

-and-

/s/ Scott N. Opincar
Scott N. Opincar (0064027)
Michael J. Kaczka (0076548)
McDONALD HOPKINS LLC
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
E-mail: sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com

SPECIAL COUNSEL FOR CHAPTER 11 TRUSTEE